[Sac. No. 42.  Department Two.—May 5, 1896.]

# W. H. McKENZIE, Respondent, *v.* SCOTTISH UNION AND NATIONAL INSURANCE COMPANY, Appellant.

Fire Insurance—Express Warranty—Watchman—Stoppage of Mill. Where a policy of fire insurance upon a sawmill contained an express warranty that during such time as the mill was idle, or not in operation, one or more watchmen should be on duty constantly day and night, and that if the mill should be shut down for more than thirty days, notice should be given to the company, and permission to remain shut down obtained and indorsed on the policy, else it should become null and void, upon breach of such warranty by failure to keep a watchman on duty during the night when the mill was idle, and keeping it shut down more than thirty days prior to loss by fire, without notice and permission as required by the terms of the policy, there can be no recovery upon the policy for such loss.

Id.—Materiality of Statement or Promise—Performance of Promise. Where there is an express warranty the question whether the fact stated or stipulated for be material to the risk or not is of no consequence, one of the very objects of the warranty being to preclude all controversy about its materiality or immateriality, or reasonableness, and, if the warranty be a statement of fact, it must be literally true, or, if it be a stipulation that a certain act shall or shall not be done, it must be literally, or at least substantially, performed, and it is immaterial to what cause noncompliance is attributable.

Id.—Code Provisions—Effect of Negligence—Breach of Warranty. Although under the Civil Code, in the absence of an express warranty, an insurer is not exonerated by the negligence of the insured, or of his agents, nor by breach of an immaterial provision, yet the policy may declare that a violation of specified provisions shall avoid it, and mere negligence cannot abrogate the provisions of the code upon the subject of breach of warranty.

Id.—Insufficient Service of Watchman.—To have a watchman who in the night-time only visited the insured mill twice, and who, during the rest of the night slept in a house from which the mill was only partially visible, is not a substantial or sufficient compliance with a requirement of the policy that a watchman should be on duty constantly day and night.

Id.—Shutting Down of Mill Without Permission—Shipping of Lumber —Opinion Evidence.—Where the evidence shows that the mill was idle and not running for more than thirty days prior to the loss by fire, it is shut down within the terms of the policy, requiring written permission to remain shut down for more than thirty days, and the opinion of a witness that it was not shut down as long as they were shipping lumber can have no effect as expert evidence to establish the contrary.

Id.—Nonsuit—Verdict against Law.—Where the evidence of the plaintiff in an action upon an insurance policy shows a noncompliance, or an insufficient compliance, with the terms of an express warranty in the policy, a nonsuit should be granted, and a verdict for the plaintiff is a verdict against law.

Appeal from a judgment of the Superior Court of Fresno County and from an order denying a new trial. J. R. Webb, Judge.

The facts are stated in the opinion.

*Van Ness & Redman*, for Appellant.

The mill having been shut down for more than thirty days prior to the fire, without the consent of the company, there can be no recovery upon the policy, and the nonsuit should have been granted. (*Stone v. Howard Ins. Co.*, 153 Mass. 495; *Day v. Insurance Co.*, 72 Iowa, 597; *England v. Westchester etc. Ins. Co.*, 81 Wis. 583; 29 Am. St. Rep. 917; *Keith v. Quincy etc. Ins. Co.*, 10 Allen, 228; *Herrman v. Adriatic etc. Ins. Co.*, 85 N. Y. 162; 39 Am. Rep. 644.) There was a breach of the policy warranty stipulating for the presence upon the premises of an active watchman. (*Trojan etc. Co. v. Firemen's Ins. Co.*, 67 Cal. 27; *Wenzel v. Commercial Ins. Co.*, 67 Cal. 438; *Rankin v. Amazon Ins. Co.*, 89 Cal. 203; 23 Am. St. Rep. 460.) Section 2629 of the Civil Code has no application to breaches of policy conditions. It refers to acts on the part of the insured, or his agents, not expressly forbidden by the policy, whereby the property is destroyed. But, if the acts whereby the fire is caused are in violation of policy stipulations, it is no excuse that they were negligently done. (*Chandler v. Worcester etc. Ins. Co.*, 3 Cush. 328; *Waters v. Merchants' etc. Ins. Co.*, 11 Pet. 219; May on Insurance, 2d ed., 614; 1 Wood on Insurance, 2d ed., 280; Richards on Insurance, 2d ed., 29.)

*Frank H. Short*, for Respondent.

The testimony is to the effect that the mill had not been shut down for thirty days prior to the fire, and, if shut down at all, for not more than three days prior to the

fire. This issue having been fairly submitted to the jury,
and determined in respondent's favor, it is conclusive.
(*Menk* v. *Home Ins. Co.*, 76 Cal. 50; 9 Am. St. Rep. 158;
*Farnum* v. *Phœnix Ins. Co.*, 83 Cal. 246; 17 Am. St. Rep.
233.) If an insured person employs a competent watch-
man to watch the premises, and the watchman neglects
to discharge his duty, the insurance company is still
liable. (Civ. Code, sec. 2629; *Sierra Milling etc. Co.* v.
*Hartford etc. Ins. Co.*, 76 Cal. 235; *Rankin* v. *Amazon
Ins. Co.*, 89 Cal. 203; 23 Am. St. Rep. 460; May on In-
surance, 341; *Murray* v. *Home Ben. Assn.*, 90 Cal. 402;
25 Am. St. Rep. 133; *West Coast Lumber Co.* v. *State etc.
Ins. Co.*, 98 Cal. 502–12; *People* v. *Central Pac. R. R. Co.*,
76 Cal. 29–36.) Conditions working forfeitures are to
be construed strictly. (May on Insurance, 3d ed., 158,
162–75, 178.) The court cannot declare as a matter of
law what is the proper degree of a watchman's care,
without adding to the contract of the parties. (May on
Insurance, 3d ed., secs. 188, 251.)

SEARLS, C.—Action to recover for loss by fire upon
insurance policy.

"Briefly stated, the facts are as follows:

"On February 20, 1893, the defendant company exe-
cuted in favor of one James Karnes its policy of insur-
ance, insuring the said Karnes against loss by fire of a
certain sawmill and the machinery therein contained
for one year from and after said date. One of the stipu-
lations of the policy was as follows:

"'Warranted by the insured that during such time as
the within-described buildings or works are idle or not
in operation, whether closed for repairs or during the
absence of workmen, or otherwise (except as otherwise
herein stated), one or more watchmen shall be on duty
constantly, day and night, in and immediately about
the said buildings or works, and, if the said buildings
or works shall at any time remain shut down for more
than thirty (30) days, notice shall be given this com-
pany, and permission to remain so shut down be ob-

tained and indorsed hereon, or this policy shall be null and void.' Permission granted for the above-described mill to remain idle until May 1, 1893.

"On September 22, 1893, Karnes transferred the insured property to plaintiff, and on September 26, 1893, with the consent of the company, assigned to him the policy of insurance thereon.

"On December 8, 1893, the property was destroyed by fire. The amount of the loss was fixed by appraisal, and the only questions in the case arise out of alleged breaches of the watchman's warranty clause which we have quoted. The facts in this connection are as follows":

The plaintiff took possession of the property under his conveyance of September 22, 1893, in the latter part of October. The mill did not run from the date of plaintiff's purchase until it was burned on the eighth day of December, 1893, but there was a quantity of lumber on hand which had been previously sawed, and which was transferred to plaintiff, and plaintiff had men employed in shipping this lumber.

No application was at any time made by plaintiff, or on his behalf, to the defendant company for leave to have the insured buildings or works described in the policy shut down or remain idle and not in operation, and no consent thereto was made or given by the defendant, or indorsed on the policy.

The plaintiff did inform Mr. Shepard, the local agent at Fresno, that the mill had been shut down. This was shortly after the mill had been shut down. The mill in question was a steam sawmill for sawing logs into lumber, and for making trays, sweat-boxes, etc.

The testimony in reference to the watchman at the mill tends to show that plaintiff was not himself at the mill. He says, on the last of October or first of November, as he thinks, he employed one C. H. Smith to go to the mill, take charge of the property, and watch it generally, and gave him authority to employ men, as he wanted them, to move out the lumber. He was em-

ployed to watch the mill, and to employ men and prepare the lumber for shipment.

C. R. Smith was a witness on behalf of plaintiff, and, after stating that he was experienced as a lumberman, and had worked at the mill prior to plaintiff's purchase, said, in substance, that plaintiff employed him on the 7th or 8th of November, 1893, to go to the mill, take charge of the property, and do everything necessary to its protection; to see to shipping the lumber and everything of that kind, and to send the bills to him. "He told me to keep a watchman up there, . . . . to keep a night watchman just as long as I thought it necessary to do it, and to take the night watchman off whenever I thought the property was safe without one, and to use my own judgment in regard to it, and I done so. I kept a night watchman at Mr. McKenzie's expense after I went up there. I think thirteen days I had a night watchman." He then explained that he found the watchman asleep, discharged him, McKenzie (plaintiff) paid him, and after that he, Smith, did the night watching himself. Smith, with three or four men, were working during the day getting lumber out for shipment. Smith slept in a house about three hundred and fifty to four hundred yards from the mill, from which house the mill was only partially visible.

Plaintiff told the witness that he did not think it necessary to employ a watchman after the storms came, and said to him: "Whenever it starts to rain or snow, you let the night watchman go," and after the 14th of October, Smith "did all the watching that was done, both day and night." His habit was to remain up until 10 o'clock P. M., go to the mill at that hour, look around, go to his house and to bed, "and then wake up in the middle of the night, perhaps 2 or 3 o'clock, and go down to the mill again, and take a walk around down through there, and would then go back and retire for the balance of the night."

On the night of the fire (December 8, 1893), Smith and the men in his employ were in the house afore-

mentioned when he heard the bark of a dog, whereupon he went to the mill and apparently found everything all right, whereupon he returned to the house and went to bed, it being then about 11:15 o'clock. At about 12:15 A. M., he awakened and found the mill on fire, and when he reached the premises the tray house had fallen in.

The belts, pulleys, etc., had been taken off the machinery and housed, the cylinders opened and oiled, and all that was deemed necessary to protect the machinery for the winter had been done from the middle to the last of November, or perhaps as late as December 5th.

Smith worked during the day with the other men in shipping lumber — superintended them and did not "work hard," and at night watched as before stated.

On his redirect examination, Smith stated that plaintiff stated to him "that in order to protect the insurance policy he had to have a night watchman," and "instructed me positively we had to have a night watchman at the mill, but he gave me discretion to employ a night watchman at his expense, or do it myself," etc.

He also gave it as his opinion as a millman that the mill was not *shut down* when it stopped working, but only when it was dismantled for the winter.

The plaintiff and Smith were the only witnesses in the case. Many of the expressions here referred to or quoted were repeated in one form or another, but the foregoing is believed to be a fair synopsis of the evidence upon the mooted points.

Upon the close of the testimony on behalf of plaintiff, counsel for defendant moved the court to grant a nonsuit upon the grounds: 1. That it appeared from the evidence that continuously from the twenty-sixth day of September, 1893, down to and including the date of the destruction of the property by fire, the insured buildings or works were idle and not in operation, and that no watchman was on duty constantly day and night, etc., as required by the policy of insurance; and 2. Upon the ground that the insured buildings or works were

shut down for more than thirty days prior to the time of the fire, within the meaning of the warranty, and that at no time did the insured apply to or obtain from defendant permission that said works should remain shut down, nor was any consent thereto given or indorsed on the policy.

The court overruled the motion, to which ruling counsel for defendant excepted, and the ruling is assigned as error. The cause was then submitted to the jury, and a verdict rendered in favor of plaintiff. This appeal is from a final judgment rendered upon the verdict, and from an order of the court denying defendant's motion for a new trial.

We shall first consider what may be termed the *watchman clause* in the policy, which we repeat:

"Warranted by the insured that during such time as the within buildings or works are idle or not in operation, whether closed for repairs or during the absence of workmen, or otherwise (except as otherwise herein stated), one or more watchmen shall be on duty constantly, day and night, in and immediately about said buildings or works, . . . . or this policy shall be null and void."

"Warranties (as is said by May in his work on Insurance, at section 157) are distinguished into two kinds: *Affirmative*, or those which allege the existence at the time of insurance of a particular fact, and avoid the contract if the allegation be untrue; and *promissory*, or those which require that something shall be done or omitted after the insurance takes effect and during its continuance, and avoid the contract if the thing to be done or omitted be not done or omitted according to the terms of the warranty."

In the matter of *affirmative* warranties, depending upon the statements made by the insured in his application, much discussion and some variance of opinion is to be found in the cases, touching their materiality to the risk, whether made for other purposes than a warranty, whether immaterial, unguarded, or superfluous, etc.

In the present case we are confronted with no diffi-
culty of this character. The case is one of an express
*promissory* warranty, which has been defined as follows:

An express warranty is a stipulation inserted in writ-
ing on the face of the policy, on the literal truth or
fulfillment of which the validity of the entire contract
depends.

" By a warranty the insured stipulates for the absolute
truth of the statement made, and the strict compliance
with some promised line of conduct, upon penalty of
forfeiture of his right to recover in case of loss should
the statement prove untrue, or the course of conduct
promised be unfulfilled. A warranty is an agreement
in the nature of a condition precedent, and, like that,
must be strictly complied with.

" Whether the fact stated or the act stipulated for be
material to the risk, or not, is of no consequence, the
contract being that the matter is as represented, or shall
be as promised; and, unless it prove so, whether from
fraud, mistake, negligence, or other cause, not proceed-
ing from the insurer, or the intervention of the law or
act of God, the insured can have no claim. . . . . One
of the very objects of the warranty is to preclude all
controversy about the materiality or immateriality of
the statement.

" The only question is, Has the warranty been kept?
There is no room for construction; no latitude; no
equity.

" If the warranty be a statement of facts, it must be
literally true; if a stipulation that a certain act shall or
shall not be done, it must be literally performed."
(May on Insurance, sec. 156, and cases cited.)

The foregoing quotation is but the enunciation in
brief form of a principle laid down by all the writers on
the subject of insurance, and enunciated in the leading
cases of this country and England.

In *Wood* v. *Hartford Ins. Co.*, 13 Conn. 533, 35 Am.
Dec. 92, a leading case on the subject of warranty, Sher-
man, J., said: " If a house be insured against fire, and

the language of the policy is 'warranted, during the policy, to be covered with thatch,' the insurer will be discharged if, during the insurance, the house be covered with wood or metal, although his risk is diminished; for a warranty excludes all argument in regard to its reasonableness, or the probable intent of the parties."

Marshall on Insurance, 249, in discussing the question, says: "It is also immaterial to what cause the noncompliance is attributable; for, if it be not in fact complied with, though, perhaps, for the best of reasons, the policy is void."

Parties may contract as they please. When a condition precedent is adopted by them in their contract, the courts will not inquire as to its wisdom or folly, but must exact its strict, or at least substantial, observance.

When we apply these rules of law to the language of the warranty in the present case, and to the acts of the insured in compliance therewith, we are forced to the conclusion that there was neither a literal nor a substantial compliance with the terms of the warranty.

The mill was idle and not in operation from the latter part of September until the date of the fire in December.

To have a watchman who during the night only visited the works before bedtime, and again at 2 or 3 o'clock in the morning, and who, during the rest of the night, slept in a house from three hundred and fifty to four hundred yards from the mill, and from which it was only partially visible, is far from complying with a covenant or warranty that "during such time as the within-described buildings or works are idle or not in operation, whether closed for repairs or during the absence of workmen, or otherwise, one or more watchmen shall be on duty constantly day and night in and immediately about the said buildings or works."

We assume that during the day the witness Smith and the men engaged with him in removing lumber from the mill yard were in such proximity to the mill as to enable them to watch it, but to sleep over a fifth

of a mile from it at night, and to only visit it twice dur-
ing each night, was not to be on *duty as a watchman con-*
*stantly* and immediately about the buildings, and, as
was said in *Rankin* v. *Amazon Ins. Co.*, 89 Cal. 203, 23
Am. St. Rep. 460: "In the case before us the terms of
the warranty are explicit as to the time of keeping a
watch, and on the undisputed evidence we think the
court ought to have held that the plaintiffs had not com-
plied therewith."

We concur also in the further remark of Paterson, J.,
in that case that, " We do not need a dictionary, nor law-
books, nor the testimony of an expert to tell us that a
man who is employed to watch in the daytime, and who
is permitted to sleep at night, is not a watchman at
night." (See, also, *Wenzel* v. *Commercial Ins. Co.*, 67
Cal. 440; *Trojan etc. Co.* v. *Fireman's Ins. Co.*, 67 Cal.
27; Wood on Insurance, 2d ed., 433–39.)

The respondent contends that there was testimony
tending to show that plaintiff employed a competent
watchman to watch the premises day and night, and if
there was any negligence it was that of the watchman,
and that he is exonerated by section 2629 of the Civil
Code. That section is as follows: "An insurer is not
liable for a loss caused by the willful act of the insured;
but he is not exonerated by the negligence of the
insured, or of his agents or others."

The ordinary negligence of the insured and his agents
has long been held as a part of the risk which the in-
surer takes upon himself, and the existence of which,
where it is the proximate cause of the loss, does not ab-
solve the insurer from liability. But willful exposure
—gross negligence—negligence amounting to miscon-
duct, etc., have often been held to release the insurer
from such liability.

To set at rest questions involving the different degrees
of negligence, and the results following therefrom, we
may reasonably suppose was the object of the framers
of our Civil Code.

Under section 2629 of the Civil Code the nice dis-

tinctions often made necessary are dispensed with, and the general proposition is established that no form of negligence on the part of the insured, or his agents or others, leading to a loss avoids the policy, unless it amounts to a willful act on the part of the insured. The code thereby sets at rest a fruitful cause of litigation.

This section was not intended, however, to absolve the insured from the performance of those acts which he has expressly covenanted to perform. To do this would be not to measure his conduct and obligations under the contract, but to abrogate it.

When the insured in the present case warranted, in case the mill was idle and not in use, to *have a watchman on duty constantly day and night, in and immediately about the buildings or works*, he bound himself to the performance of specific acts, from the performance of which no negligence could exonerate him.

It may well be that, had the plaintiff complied with the warranty by keeping a watchman on duty as specified in the policy, that negligence of the watchman as to the manner of discharging such duty would come within the letter and spirit of section 2629 of the Civil Code. Whether this result would follow in such a case it is unnecessary to determine, as the question is not involved.

The case at bar does not present an instance of the negligent performance of a contract of warranty, but of an entire omission to perform a vital portion of such contract.

The object of promissory warranties is usually to bind the insured to the performance of certain acts, which, but for such warranty, he would not be bound to perform.

Ordinary negligence by the insured did not, prior to the adoption of our code, release the insurer from liability; yet it has always been held that the conditions of an express promissory warranty were binding upon the insured according to their tenor and legal effect.

All that our Civil Code has done in relation to negli-

gence is to declare that his negligence shall not, or that of his agent, etc., shall not, exonerate the insurer.

But the same code provides that: "A policy may declare that a violation of specified provisions thereof shall avoid it; otherwise the breach of an immaterial provision does not avoid the policy." (Civ. Code, sec. 2611.)

The section is as follows: "A breach of warranty, without fraud, merely exonerates an insurer from the time that it occurs, or, where it is broken in its inception, prevents the policy from attaching to the risk."

The whole article of the code on warranties would be rendered practically inoperative if mere negligence could abrogate the several provisions thereof.

Counsel for respondent relies upon *Sierra Milling etc. Co.* v. *Hartford Fire Ins. Co.*, 76 Cal. 235, in support of his contention here. That case involved the liability of an insurance company under a similar clause in reference to a watchman.

The facts showed a substantial compliance with the terms of the warranty, and the only thing in the case tending to uphold the contention here is an expression in the opinion, not necessary to the determination of the case, wherein the learned commissioner who wrote the opinion, in alluding to the allegations of the answer, says: "To us this seems to be nothing more than an allegation of negligence on the part of the watchman, and for this the plaintiff was not responsible under section 2629 of the Civil Code."

The expression was evidently only used to show that in the view of the writer the section referred to qualified the character of the services required by a watchman, who was at his post substantially as required by the letter of the warranty, and has no application to a case in which the watchman required to be on guard was quietly sleeping over a thousand feet away.

As the evidence of plaintiff all showed affirmatively a nonfulfillment of the warranty, the court in the present instance should have granted defendant's motion for

a nonsuit; and the verdict of the jury on precisely the same evidence was contrary to law.

2. We are also of opinion that there was a violation by plaintiff of the further clause in the warranty under which "if the buildings or works shall at any time remain shut down for more than thirty (30) days, notice shall be given this company, and permission to remain so shut down be obtained, and indorsed hereon, or this policy shall be null and void."

The testimony of plaintiff is full and explicit to the effect that the mill was idle and not in use from September 25th to December 8th, the date of the fire. No lumber was cut, and nothing was done in or about the property except to take away and ship lumber previously cut, except that in the latter part of November they prepared the machinery for winter by removing belts, etc.

It is true that the witness Smith gave it as his opinion that the mill was not "shut down" as long as they were shipping lumber. But we see nothing in the testimony to call for the opinion of an expert.

To say that a sawmill is *shut down* when it is not running and is idle is to use an expression which is perfectly plain and easily understood by the average layman, and calls for no expert opinion. To assert the contrary is idle. It would be but little more unreasonable to say that a train standing at a station had not stopped because freight was being delivered from the cars.

The plaintiff said in his testimony: "I told Mr. Shepard that it was shut down. Mr. Shepard is the local agent of the defendant here at Fresno. I told him that the mill had been shut down. This was after the mill had been shut down—shortly afterward. I made no application to Mr. Shepard or anybody else to indorse consent upon the policy, and, as a matter [of] fact, I never obtained written consent from Mr. Shepard or anybody else to have the mill remain shut down."

Under such circumstances we are of opinion .there

was a violation of the second clause of the warranty in not applying for and procuring the consent of the insurer to be indorsed upon the policy for more than thirty days after the works shut down.

We recommend that the judgment and order appealed from be reversed and a new trial ordered.

HAYNES, C., and BRITT, C., concurred.

For the reasons given in the foregoing opinion the judgment and order appealed from are reversed and a new trial ordered.                                      ○

TEMPLE, J., HENSHAW, J., McFARLAND, J.