[S.F. No. 23105. In Bank. Apr. 18, 1975.]

HOLZ RUBBER COMPANY, INC., et al.,
Plaintiffs and Respondents, v.
AMERICAN STAR INSURANCE COMPANY et al.,
Defendants, Cross-complainants and Appellants;
MAX ELSON, Defendant, Cross-defendant and Appellant;
BILL JOSEPH, Cross-defendant and Appellant.

## COUNSEL

Long & Levit, John B. Hook and Albert E. Cronin, Jr., for Defendants, Cross-complainants and Appellants.

Mayall, Hurley, Knutsen, Smith & Green and Edwin Mayall for Defendant, Cross-defendant and Appellant and for Cross-defendant and Appellant.

Farella, Braun & Martel, Jerome I. Braun, William R. Friedrich, William Frank Roberts and Robert A. Haughwout for Plaintiffs and Respondents.

## OPINION

SULLIVAN, J.—Plaintiffs[1] (hereafter referred to collectively as "Holz") brought this action against defendants American Star Insurance Company (Star) and United States Fidelity and Guaranty Company (U.S.F. & G.) and their agent Max Elson, doing business as Max Elson Insurance Company (Elson), seeking declaratory relief and money damages under two policies of fire insurance for the loss of plaintiffs' stock due to fire.[2] U.S.F. & G. and Star denied liability under the policies and cross-complained against their agent Elson and his associate Bill Joseph for indemnity. The case was tried to a jury, the parties stipulating that the amount of the stock loss under each policy was the sum of $61,199.22.

The jury returned verdicts as follows. On the complaint: in favor of plaintiffs and against Star in the sum of $61,199.22; in favor of plaintiffs and against U.S.F. & G. in the sum of $61,199.22; and in favor of Elson and against plaintiffs; on the cross-complaints in favor of Star and against Elson and Joseph in the sum of $61,199.22; and in favor of Elson and Joseph and against U.S.F. & G. Judgment was entered accordingly on the verdicts. Defendant Star appeals from that portion of the judgment in favor of plaintiffs and against Star. Cross-defendants Elson and Joseph appeal from the judgment against them and in favor of Star. Defendant U.S.F. & G. appeals from that portion of the judgment in favor of plaintiffs and against U.S.F. & G. and that portion of the judgment in favor of cross-defendants Elson and Joseph and against U.S.F. & G.

The several corporate plaintiffs constitute a rubber products manufacturing business in Lodi, California. Founded in 1936 by William L. Holz (Mr. Holz), president of the component corporations, the company was

---

[1]Plaintiffs are: Holz Rubber Company, Inc., Holz Rubber Manufacturing Co., Inc., William G. Holz Co., and Holz Plastics Inc.

[2]In a separately stated cause of action, plaintiffs alleged that Elson, acting as agent for U.S.F. & G. and Star, induced Holz to enter into the insurance contracts by falsely representing that the loss in question would be covered under the policies.

Plaintiffs also sued U.S.F. & G., General Accident and Life Assurance Limited, St. Paul Fire and Marine Insurance Company, National Union Fire Insurance Company and their agent Elson to recover for equipment losses allegedly covered by other insurance policies. At the conclusion of plaintiffs' case, the trial court granted motions for nonsuit in favor of the defendant insurance companies, finding that the equipment policies did not cover the losses in question. Plaintiffs' motion for a directed verdict against Elson for the equipment losses was granted, and Elson did not appeal from this judgment.

eventually moved to its present location on South Sacramento Street in Lodi. As the enterprise expanded, additional buildings were acquired and constructed so that by the time of trial Holz occupied 15 buildings on the east and west sides of Sacramento Street. Approximately half of these buildings were equipped with an automatic sprinkling system designed to minimize losses in the event of fire.

Since 1949, Mr. Holz's insurance needs had been handled by defendant Max Elson, an insurance agent and broker doing business under the name of Max Elson Insurance Company. Mr. Holz or his manager, Stanley Folsom, decided upon the type and amount of coverage desired, generally following Elson's recommendations. Elson then placed the coverage with insurance companies of his own selection.

Bill Joseph, an associate of the Elson agency, had charge of the Holz account at the time the policies in question herein were issued. Commencing in January of 1966, the agency, through Joseph, obtained two types of fire insurance coverage for the Holz operations: specific coverage on the buildings and equipment, designating the particular buildings insured, and blanket coverage on the inventory, insuring stock wherever located on the Holz premises as described in the policy. In the instant case, we are concerned only with the policies covering inventory.

The Elson agency placed one-half of the insurance on the inventory with defendant U.S.F. & G. and one-half with defendant Star. The policies were identical, each running for a period of three years, from January 1, 1966, to January 1, 1969, and providing coverage for 50 percent of any fire-induced stock losses but not exceeding $125,000. The policies described the covered locations as 1129-1201 and 1202-10 South Sacramento Street. Although the 1202-10 designation referred to the area on the east side of the street, some of the buildings located there had not been assigned street numbers.

Both the U.S.F. & G. and Star policies contained an identical "Automatic Sprinkler Warranty"[3] which we set forth in full in the margin.[4]

---

[3]This warranty is a "standard form" (Form 20) first disseminated by the Standard Forms Bureau in July 1933.

[4]"This policy being written at a reduced rate based on the protection of the premises by an automatic sprinkler system, it is a condition of this policy that, so far as the sprinkler system and the water supply therefor are under the control of the insured, due diligence shall be used by the insured to maintain them in complete working order, and that no change shall be made in the said system or in the water supply therefor without the consent in writing of this company and/or the Pacific Fire Rating Bureau."

The policies were written on the basis of a sprinklered building rate, which was about one-fifth or one-sixth the unsprinklered building rate. At the time they were issued in January 1966, all but two of the buildings on the Holz premises were sprinklered; the unsprinklered buildings were designated as 1231 South Sacramento Street.

There is a conflict in the testimony as to whether the policies were intended to cover stock stored in the unsprinklered buildings. Representatives from both insurance companies testified that the policies were issued upon the assumption that all buildings in which inventory would be stored were sprinklered. Joseph testified that when he placed the insurance, he advised the companies that all buildings containing insured stock were sprinklered, and that he knew the policies were written at a sprinklered rate based upon this representation. He further testified that he had no intention of insuring the unsprinklered buildings at 1231 South Sacramento Street, as he and Mr. Holz had decided not to cover these structures. Mr. Holz and his manager Folsom, called as witnesses on plaintiffs' case in chief, initially testified that they assumed that the stock being stored in the unsprinklered buildings was covered by the policies; the former stated that he was sure that this fact was considered in determining the rates charged. On plaintiffs' case in rebuttal, however, Mr. Holz testified that the stock stored in the unsprinklered buildings in existence when the policies were written was confined to remnants and "no value" stock which was never inventoried or included on the reporting forms sent to the insurance companies.[5]

Approximately one year after issuance of the Star and U.S.F. & G. policies, Holz began construction of an additional warehouse structure on the east side of Sacramento Street, identified at trial as Building No. 5.[6] The four other structures (Buildings No. 1 - 4) which had been built by Holz on the east side of the street were physically connected with one another. Building No. 5 was detached because of a 20-foot utility

---

[5]The "Value Reporting Clause" of the policies provided in relevant part as follows: "(a) It is a condition of this policy that the insured shall report in writing to this company on the last day of each calendar month of the policy term, the exact location of all property covered hereunder, the total actual cash value of such property at each location and the amount of creditable specific insurance in force at each location, all as of the last day of that month. . . . (b) If at the time of any loss, the insured has failed to file with this company, reports of values as above required, this policy . . . shall cover only at the locations and for not more than the amounts included in the last report of values less the amount of creditable specific insurance reported, if any, filed prior to the loss. . . ."

[6]The building was so identified by the Lodi Fire Department in accordance with its key numbering system.

easement of the City of Lodi on its south side. However it was connected with Buildings 1 - 4 by compressed air, gas, water and power lines. The entire storage area on the east side of the street was enclosed by a six-foot wire mesh fence with a barbed wire top. Spaces inside the fence not occupied by buildings were used by Holz for open storage; additional unfenced open areas on the east side were used for parking.

Following its procedure with the other four buildings, Holz planned to have Building No. 5 equipped with an automatic sprinkler system upon the structure's completion.[7] Mr. Holz and Wilbur Barnes, president of the California Automatic Water Sprinkler Company, testified that a building must be complete before a sprinkler system can be installed because the system is suspended from the framework of the building and because it is dangerous to install sprinklers during the course of construction.

In March 1967, when Building No. 5 was practically finished, Folsom solicited from two companies bids for installation of a sprinkler system. In July 1967 he signed an order to purchase an ordinary hazard system. However, the Pacific Fire Rating Bureau (Bureau)[8] whose approval was necessary to qualify the building for the lower "sprinklered" insurance rates, refused to approve the proposed system; instead, the Bureau recommended installation of a "calculated system." On January 2, 1968, Holz ordered the latter system; on January 31 the Bureau approved the plans. On the morning of February 13, 1968, Building No. 5 was destroyed by fire. At that time, the sprinkler equipment was lying outside of Building No. 5 awaiting installation.

Because of its need for additional storage space, Holz had begun moving inventory into Building No. 5 before it was fully completed. According to the testimony of Mr. Holz, some of this stock came from other buildings on the premises, sprinklered as well as unsprinklered. The inventory in Building No. 5 was included in the monthly reports sent by Holz to the insurance companies.

Joseph of the Elson agency admitted having knowledge that stock was being stored in Building No. 5 while it was unsprinklered and that Holz

---

[7]The City of Lodi issued a building permit for this structure on the basis of plans indicating that the building was to be sprinklered.

[8]The Pacific Fire Rating Bureau is a nonprofit organization supported by member insurance companies on an assessment basis. It fixes fire insurance rates for its member companies and provides them with inspection services on fire risks. Both Star and U.S.F. & G. contributed to its support as subscribing members.

was including in the monthly reports all stock on the premises, including that contained in Building No. 5. However, he denied ever telling Folsom or Mr. Holz that the inventory placed in the unsprinklered building would be covered under the terms of the policies. Mr. Holz and Folsom testified that, as a result of their dealings with the Elson agency over the years, it was their understanding that stock placed in a newly constructed unsprinklered building was covered under a blanket policy at sprinklered building rates, as long as Holz installed sprinklers within a reasonable time.

Neither Star nor U.S.F. & G. was ever expressly informed that stock was being stored in Building No. 5 prior to installation of sprinklers, and both companies denied any prior knowledge of this fact. Evidence was introduced from which the jury could have inferred that U.S.F. & G. either had or should have had such knowledge.[9]

As a result of the fire which destroyed Building No. 5, Holz lost stock worth $122,398.44. Both U.S.F. & G. and Star refused to pay this loss under their respective policies because the stock had been stored in an unsprinklered building. The present action then followed. The trial court construed the provision in each policy entitled "Automatic Sprinkler Warranty" (see fn. 4 *ante*) and ruled that whether the warranty was breached depended on whether Holz used due diligence in respect to the installation of a sprinkler system in Building No. 5. The court so instructed the jury.[10]

---

[9] On March 7, 1967, Joseph sent a memorandum to U.S.F. & G. asking it to add an additional $20,000 coverage to an existing fire insurance policy on the Holz buildings to cover Building No. 5 itself. In response, Joseph received a memo from U.S.F. & G. asking for a breakdown of the $20,000 as to building, equipment and sprinkler leakage. Joseph responded that since the $20,000 additional coverage was on a new building, no sprinkler leakage would be required and that this building was simply an addition to the existing structure already insured.

An endorsement was added to the existing policy, insuring Building No. 5 for $20,000. The policy contained a sprinkler warranty identical to the one at issue in the case at bench. U.S.F. & G. nevertheless paid the fire loss of $20,000 on the building itself.

[10] The court gave the following "Court's Instruction": "The sprinkler warranty which is contained in the two insurance policies on stock which are in evidence in this case have been interpreted as a matter of law by the court to require that under the facts of this case the plaintiffs were required to use due diligence in bringing about the installation of a sprinkler system in the new building referred to as Building No. 5. This is the court's interpretation of the policy provision despite the fact that the warranty provision uses the word maintain. Plaintiffs have the burden of proving by a preponderance of evidence that they complied with the provisions of the sprinkler warranty as interpreted by the court."

It is the interpretation of this clause which constitutes the central issue on these appeals and towards which the contentions of the various parties are primarily directed. For convenience, we treat the several appeals separately.

1. *Appeal of Star from that portion of the judgment in favor of plaintiffs and against Star.*

■ Star's sole contention is that the trial court improperly interpreted the sprinkler warranty clause (see fns. 4 and 10 *ante*) and that since according to the uncontradicted evidence the stock was stored in a building without a sprinkler system, the court should have directed a verdict in its favor. Star argues that the warranty was a promise by Holz that it would not store stock covered by the policy in a building not equipped with a sprinkler system. Compliance with this warranty was a condition precedent to recovery for loss under the terms of the policy. Therefore, so the argument goes, Holz's conduct in storing stock in Building No. 5 pending installation of sprinklers breached the warranty and exonerated Star from any contractual liability.

As we explain *infra,* Star's interpretation of the sprinkler warranty ignores ambiguities in the wording of the provision itself as well as those emerging from the insurance contract as a whole. ■ At the same time, it violates the fixed principle of California law which requires us to resolve uncertainties in a policy of insurance against the insurer. (*Crane v. State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115-116 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].) We therefore reject Star's contention and hold that the trial court correctly interpreted the warranty.[11]

---

[11]Holz contends that the automatic sprinkler clause is not a warranty at all and is not determinative of coverage, its only significance in the policies being in connection with the premium rate allowable for a sprinklered building risk. While Holz's entitlement as a nonappealing party to raise the point is questionable (see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal § 214, pp. 4204-4205) and while Holz makes no attempt to justify its doing so on the basis of a request of us to review the trial court's determination for the purpose of negativing prejudice to the appellants from any errors (6 Witkin, *op. cit.,* § 217, at pp. 4207-4208), we proceed to consider the point. We reject Holz's claim and briefly explain why it lacks merit.

Holz argues that the sprinkler endorsement is not a warranty at all, but rather is concerned only with a reduced premium. On this basis, Holz claims that breach of this provision does not affect coverage, so that as long as the destroyed stock was on the premises described in the policy, it was insured regardless of any sprinkler system.

Provisions of the Insurance Code dealing with warranties do not permit us to adopt this construction of the endorsement. Section 441 provides that "[a] statement in a policy of a matter relating to the person or thing insured, or to the risk, as a fact, is an express

An examination of the language of the sprinkler provision itself discloses patent ambiguities on the questions of the insured's duty in respect to the sprinklering of buildings not in existence at the inception of the policy and the insured's right to use such buildings for the storage of stock pending installation of sprinklers. Under the terms of the endorsement, the insured warranted that the premises were protected by an automatic sprinkler system (see fn. 4, *ante*), and promised to use due diligence in maintaining the existing system. In employing the word "maintain," the provision describes only the insured's duty with respect to the sprinkler system in existence when the policy was first issued. The endorsement fails to anticipate the obvious possibility of the construction of new buildings on the insured's premises and thus does not specify the insured's obligation with respect to sprinklering such newly constructed buildings. It contains no language requiring sprinkler installation in a new building prior to its use for the storage of insured stock. This manifest omission creates uncertainty which the insurer could have easily avoided by specifying the insured's obligation under these circumstances. In the absence of any such specification, the sprinkler endorsement is reasonably susceptible of the interpretation that the insured is permitted to use newly constructed buildings for the storage of stock prior to installation of sprinklers, its only duty being to use due diligence in installing a sprinkler system.

We do not stop here. ▪ An insurance policy, like any other contract, must be construed as an entirety, with each clause lending meaning to the other. (*Jurd* v. *Pacific Indemnity Co.* (1962) 57 Cal.2d 699, 704 [21 Cal.Rptr. 793, 371 P.2d 569].) In interpreting the policy, we must take cognizance of the reasonable expectations of the parties in entering into the agreement. (*Herzog* v. *National American Ins. Co.* (1970) 2

warranty thereof." Under section 445, "[a] statement in a policy, which imports that there is an intention to do or not to do a thing which materially affects the risk, is a warranty that such act or omission will take place." No particular form of words is necessary to create a warranty. (Ins. Code, § 442.)

Applying these rules to the case at bench, we conclude that the sprinkler provision is a material warranty. The endorsement expressly provides that maintenance of the sprinkler system in working order "is a condition of this policy." The evidence established that the rate charged for a sprinklered building risk was about one-fifth or one-sixth of the unsprinklered building rate. Representatives of both insurance companies testified that the existence of a sprinkler system significantly affected the amount of fire insurance coverage they were willing to provide. The importance of a sprinkler system in determining rate and extent of coverage is based upon its effectiveness in avoiding or minimizing losses due to fire. Since the purpose of the Star policy was to protect against fire-induced losses, we are satisfied that the sprinkler endorsement directly affected the risk undertaken by the insurer and is therefore a material warranty.

Cal.3d 192, 197 [84 Cal.Rptr. 705, 465 P.2d 841]; *Atlantic Nat. Ins. Co.* v. *Armstrong* (1966) 65 Cal.2d 100, 112 [52 Cal.Rptr. 569, 416 P.2d 801]; *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 868-869 [27 Cal.Rptr. 172, 377 P.2d 284].)

▇ In the case at bench, consideration of the policy as a whole reinforces our conclusion that the contract is ambiguous on the question of the insured's duty with respect to the installation of sprinklers in newly constructed buildings and to the use of such buildings pending installation of sprinklers. The policy was written on a "blanket" basis. The coverage clause of the policy provides that stock is insured while contained in "*any* building, shed or structure, or on the premises, and (a) while in, on, or under sidewalks, streets, platforms, alleyways or open spaces, provided such property be located within 50 feet of the described premises, and (b) while in or on cars and vehicles within 300 feet of the described premises; all within the limits of the State of California." (Italics added.) In its brief, Star describes "blanket coverage" to mean that the policy insures "all stock on the insured's designated premises and not merely stock contained in a specified building. This also means that the policy would automatically cover stock contained in new buildings constructed by the insured after the policy went into effect. Thus, there would be no requirement that the insurance company be advised of the new buildings as long as the stock contained therein was reported to the Company and a premium paid thereon." Thus, under the express terms of the policy and by Star's own admission, coverage is provided for stock located *anywhere* on the insured's premises. Had the stock destroyed in the case at bench been located outside of a building, unprotected by a sprinkler system, coverage under the policy could not have been contested. The fact that the policy provides such extensive blanket coverage increases the ambiguity created by the failure of the "Automatic Sprinkler Warranty" to address the question of the insured's obligation with respect to storing stock in a newly constructed building pending installation of sprinklers.

Of even greater significance is the policy provision expressly granting permission "[f]or the building(s) containing property covered hereunder to be in course of construction, alteration or repair, all without limit of time but without extending the term of this policy, and to build additions thereto, and this policy, under its respective item(s), shall cover in such additions in contact with such building(s)." Thus, the policy itself contemplated construction by the insured of new buildings on the premises and expressly provided coverage for stock stored in such

buildings during the course of construction. Testimony at trial indicated that sprinkler systems generally are not installed until building construction is completed. Were we to adopt Star's interpretation of the sprinkler warranty as prohibiting use of newly constructed buildings prior to installation of sprinklers, the policy would be internally inconsistent. No inconsistency exists if the sprinkler warranty is interpreted to permit use of new buildings prior to sprinkler installation and to impose on the insured only the duty to use due diligence in installing such sprinklers.

The case law although scanty is supportive of our above conclusion. In *Sandberg* v. *Dubuque F. & M. Ins. Co.* (1939) 32 Cal.App.2d 673 [90 P.2d 586] the court dealt with a fire insurance policy covering among other things stock situated at a specified street address and containing an automatic sprinkler provision identical in language with the one now before us. At the designated address the insured had three buildings in which it stored stock but only two of which were equipped with an automatic sprinkler system. Stock was lost in a fire which destroyed the unsprinklered building. Observing that any ambiguity in the policy was to be interpreted against the insurer, the Court of Appeal held that these contents were covered by the policy. In reaching its decision, the court noted that since the policy expressly provided coverage for stock located on the insured's premises, it was immaterial that the particular building containing the stock destroyed by fire was not protected by a sprinkler system. *Sandberg* is distinguishable from the case at bench in that there, the building destroyed by fire had been situated on the insured's premises at the time the policy was issued. Nevertheless, *Sandberg* is significant since it holds that the sprinkler endorsement which we are called upon to interpret does not ipso facto preclude coverage of stock stored in an unsprinklered building.

In *Charles Dowd Box Co.* v. *Fireman's Fund Insurance Co.* (1966) 351 Mass. 113 [218 N.E.2d 64], the Supreme Judicial Court of Massachusetts held that a provision in a fire insurance policy prohibiting the insured from making unsprinklered additions or extensions to buildings without immediately notifying the rating association was not breached by the insured's use of an unsprinklered extension for the storage of stock pending installation of a sprinkler system. As in the case at bench, the sprinkler endorsement in *Dowd* was silent on the question of whether the insured was permitted to use an addition or extension for the storage of stock prior to the installation of a sprinkler system. Furthermore, the policy contained provisions which gave the insured the right to construct

additions to buildings and to make such use of the premises as was incidental to the occupancy.

The court concluded that an ambiguity was thereby created with respect to the rights of the insured in using unsprinklered additions. In holding that use of such unsprinklered additions for the storage of stock was not prohibited by the sprinkler warranty, the court stated: "Insurance policies 'are to be construed most strongly against the insurer, and doubtful language is to be resolved against it . . . .' [Citations.] We will not import into these policies a condition favorable to the insurer which was not provided for by the terms of the agreement. We construe the sprinkler clause to allow the plaintiffs *a reasonable amount of time in which to install a sprinkler system in any extension or addition.*" (*Id.,* 218 N.E.2d at p. 68; italics added.)[12]

■ We reiterate that an insurer who wishes to condition its contractual liability upon the insured's conformance with certain conduct must do so in clear, unambiguous language. (*Ensign* v. *Pacific Mut. Life Ins. Co.* (1957) 47 Cal.2d 884, 888 [306 P.2d 488].) As we pointed out in *Ensign* quoting from *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914]: "If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the

---

[12]Star cites the case of *Buehler Corporation* v. *Home Insurance Company* (S.D.Ind. 1973) 358 F.Supp. 15, affirmed (7th Cir. 1974) 495 F.2d 1211, in support of its interpretation. In *Buehler,* the court found that the insured's failure to repair a broken valve in a sprinkler system, leaving the system inoperative for about four months, constituted a breach of a sprinkler warranty similar to the one at bar. Therefore, the insured was precluded from recovering for a loss incurred as the result of a fire which occurred while the system was inoperative. *Buehler* dealt with the issue of the insured's obligation to use due diligence in maintaining the sprinkler system in existence at the inception of the policy. As the case does not consider the question of the insured's duty with respect to installing sprinklers in a newly constructed building, it has no value as precedent in the case at bench.

Star's reliance on *McKenzie* v. *Scottish U. & N. Ins. Co.* (1896) 112 Cal. 548 [44 P. 922] is similarly misplaced. In *McKenzie* the warranty contained in a fire insurance policy provided that "one or more watchmen shall be on duty constantly, day and night . . . or this policy shall be null and void." The insured failed to keep a watchman on duty at all times, thereby breaching the warranty. The court found that this breach of warranty precluded the insured's recovery under the policy. *McKenzie* does not help resolve the issue we are faced with. The warranty in *McKenzie* was unambiguous, and it was clear that the insured's conduct breached this warranty. On the other hand, in the case at bench the warranty is ambiguous on the question of the insured's duty under the particular circumstance involved, and we are called upon to determine whether the insured's conduct constituted a breach thereof.

person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured."

■ Since a "semantically permissible" construction of the policy in the case at bench will "fairly achieve its manifest object of securing indemnity to the insured for the losses to which the insurance relates" (*Crane* v. *State Farm Fire & Cas. Co., supra,* 5 Cal.3d at p. 115), we adopt such a construction. Accordingly, we hold that under the facts of this case, the warranty required only that Holz use due diligence in installing a sprinkler system in the new building and did not prohibit use of this building for storage of insured stock pending installation of this system. This was in essence the court's instruction to the jury (see fn. 10, *ante*). Since the jury impliedly found on substantial evidence that Holz exercised due diligence in installing a sprinkler system in Building No. 5,[13] Star was properly held liable under the terms of the policy.

2. *Appeal of U.S.F. & G. from that portion of the judgment in favor of plaintiffs and against U.S.F. & G.*

Defendant U.S.F. & G. raises four contentions on appeal. Like Star, it attacks the trial court's construction of the sprinkler warranty. Our disposition of this issue adversely to Star is similarly applicable to U.S.F. & G.

■ It is also contended by U.S.F. & G. that the trial court erred in refusing to submit to the jury its affirmative defense of fraud and concealment, the facts of which were allegedly first discovered at trial. Mr. Holz and Folsom initially testified that when the policies were first issued in January of 1966, stock was being stored in two unsprinklered buildings. They further stated that some of this stock was subsequently moved from these unsprinklered buildings to Building No. 5 and therefore formed part of the inventory destroyed by the fire.[14] There-

[13]The trial court instructed the jury that "[t]he defendant insurance companies are entitled to your verdict if either or both of the defenses of breach of the sprinkler warranty or an increase of hazard, are established . . . ." The court further instructed the jury that to establish compliance with the warranty, plaintiffs must prove by a preponderance of the evidence, that they exercised due diligence in bringing about the installation of a sprinkler system in Building No. 5. Therefore, in returning a verdict in favor of Holz and against Star, the jury necessarily determined that Holz exercised due diligence in having a sprinkler system installed in this building.

[14]After this testimony was given, counsel for Star and counsel for U.S.F. & G. moved to add the affirmative defense of concealment and misrepresentation to their answer, asserting that the policies were issued on the basis of the representation that all buildings on the insured's premises were sprinklered. They claimed that they would not have

after, representatives of both insurance companies and cross-defendant Joseph testified that the policies were issued on the assumption that all buildings in which stock was being stored were sprinklered. Mr. Holz, upon recall in rebuttal, stated that the stock stored in these unsprinklered buildings was "no value" stock and that accordingly it was never inventoried or included in the reporting forms submitted to the insurance companies.[15]

The gist of U.S.F. & G.'s argument is that this testimony establishes three bases on which to ground its claim of misrepresentation and concealment: (1) Holz's failure to inform U.S.F. & G. that stock was being stored in two unsprinklered buildings at the time the policy was issued; (2) Holz's failure to inform U.S.F. & G. that it was storing stock in Building No. 5 prior to installation of sprinklers; and (3) Holz's alleged failure to include in the reporting forms submitted to the insurance company stock moved from the unsprinklered buildings to Building No. 5. We conclude that none of these asserted omissions on the part of Holz compelled the court to submit the affirmative defense to the jury.

■ In order to constitute grounds for avoidance of an insurance policy, misrepresentation or concealment must be with respect to a material fact.[16] (Ins. Code, §§ 331, 332, 359; *Thompson* v. *Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 916 [109 Cal.Rptr. 473, 513 P.2d 353].) Materiality is determined by the probable and reasonable effect that truthful disclosure would have had upon the insurer in determining the advantages of the proposed contract. (Ins. Code, §§ 334, 360; *Thompson* v. *Occidental Life Ins. Co., supra,* 9 Cal.3d at p. 916.) ■ Essentially, we must decide whether the insurer was misled into accepting the risk or fixing the premium of insurance. (7 Couch on Insurance (2d ed. 1961) § 35:45, pp. 54-55; 9 Couch on Insurance (2d ed. 1962) § 38:41, pp. 363-365.)

---

written the policies for the same coverage at the same rate had they known that stock was being stored in unsprinklered buildings. The court indicated that it would grant the motion and permit the defense to be raised if the proferred evidence would support it.

[15]At the conclusion of the evidence on both sides, the court ruled as a matter of law that the defenses of concealment and misrepresentation were not appropriate factual issues to be presented to the jury.

[16]The insurance policy itself provides: "This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any *material* fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto." (Italics added.)

Applying this standard to the facts before us, we find that the first two omissions of Holz cited by U.S.F. & G. in support of its argument were not material. With respect to the storage of stock in the two unsprinklered buildings in existence at the inception of the policy, U.S.F. & G. does not challenge Folsom's testimony that this stock was never inventoried or included in the reporting forms submitted to the insurance companies. Indeed, U.S.F. & G. relies upon this testimony in making its argument. If the stock was not reported to the company, it was not covered by the policy. The fact that uninsured stock was being stored in unsprinklered buildings cannot be deemed to be a "material" fact, the nondisclosure of which should allow U.S.F. & G. to avoid its obligations under the contract.

■ Our interpretation of the Automatic Sprinkler Warranty disposes of the argument that Holz's storage of stock in the newly constructed building was a material fact of which U.S.F. & G. should have been informed. We have determined that under the terms of the policy, U.S.F. & G. assumed the risk of covering stock stored in a new unsprinklered building pending installation of sprinklers. The undisputed evidence established that U.S.F. & G. had knowledge that Building No. 5 was being constructed on the insured's premises. In storing stock in this new building during and after construction, Holz was merely exercising a contractual right. Thus, it was under no obligation to inform U.S.F. & G. of its conduct.[17]

■ As its final ground for fraud and concealment, U.S.F. & G. apparently claims that stock stored in the unsprinklered buildings and moved to Building No. 5 was never included in the reporting forms submitted to the company but was included in the claim for loss. This assertion finds absolutely no support in the record. No evidence was introduced by any party which would tend to prove that the value of stock stored in Building No. 5 was not reported to the insurer. To the contrary, the testimony established that Holz assumed the policies covered all stock placed in the newly constructed building and therefore included its value in the monthly reports submitted to Star and U.S.F. & G.

[17]This conclusion is supported by the fact that the jury were instructed to render their verdict in favor of the insurers and against Holz if they found that the insurers had established their defense of "increase in hazard." This defense was based on a clause in the insurance contracts providing: "Unless otherwise provided in writing added hereto this company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured . . . ." Therefore, in finding for Holz, the jury necessarily determined that Holz's conduct in placing stock in Building No. 5 did not increase the hazard assumed by the insurers under the policy.

█ A related contention of U.S.F. & G. is that the trial court erred in ruling as a matter of law that Holz did not breach the policy's monthly reporting requirement by failing to specify therein the storage of stock in Building No. 5.[18] The court ruled that Holz satisfied this reporting requirement by stating one value for all stock stored on the Lodi premises. We agree with the trial court's determination for several reasons.

The language of the policy itself indicates that all of the insured's premises at Lodi were considered to be a single location for purposes of the reporting requirement. The first page of the insurance contract states that it "covers Lodi inventory." The "Coverage Clause" of the policy specifies that it insures Holz's stock "all only while contained in any building, shed or structure, or on the premises . . . ." The "Limit of Liability Clause" provides 11 blank lines to be filled in for the purpose of designating the limitation on liability at each location covered. The entire Lodi premises are described in blank No. 1 as a single location. At best, the policy is ambiguous with respect to the specificity required of the insured in designating locations in its monthly reports. Construing this ambiguity against the insurer (*Crane* v. *State Farm Fire & Cas. Co., supra,* 5 Cal.3d at p. 115), we are satisfied that as the trial court ruled, Holz complied with the reporting requirements of the policy by specifying one value for all Lodi stock covered and including in this figure the value of stock stored in Building No. 5.

Furthermore, in reporting values as it did, Holz was merely following Joseph's instructions.[19] Holz used this manner of reporting during the

---

[18]In making this argument, U.S.F. & G. relies upon the following three clauses of the policy:

"2. Exclusion Clause: B. This policy does not cover at any location where the insured had property as above described which was not declared to this company unless included in the first report of values as provided in the value reporting clause and is then subject to the limit of liability of an acquired location as indicated in item no. 12 of paragraph 4.

"4. Limit of Liability Clause: 12. At any other location acquired if included in the next succeeding monthly report of values as provided in the Value Reporting Clause—$10,000.

"9. Value Reporting Clause: (a) It is a condition of this policy that the insured shall report in writing to this company on the last day of each calendar month of the policy term, the exact location of all property covered hereunder, the total actual cash value of such property at each location and the amount of creditable specific insurance in force at each location, all as of the last day of that month . . . . (b) If at the time of any loss, the insured has failed to file with this company, reports of values as above required, this policy, . . ., shall cover only at the locations and for not more than the amounts included in the last report of values . . . ."

[19]The evidence established that Joseph had instructed Holz to include in its monthly insurance report a total figure for the stock located on the Lodi premises, whether on the

entire period for which the policy was in effect, that is, from January 1, 1966, until the date of the fire on February 13, 1968. U.S.F. & G. apparently accepted the reports without objection. Under these circumstances, U.S.F. & G. became bound by its agent's interpretation of the reporting requirement (Civ. Code, § 2315) and waived its right to object to this alleged "defect." (9 Couch on Insurance (2d ed. 1962) § 37:1754, p. 328.)

■■■ U.S.F. & G.'s final contention is that the trial court committed error in instructing the jury on the issue of waiver of the sprinkler warranty by U.S.F. & G.[20] We need not deal with the merits of this contention in considering U.S.F. & G.'s appeal from that portion of the judgment in favor of Holz and against U.S.F. & G., since the fact that the verdict was against *both* insurers makes it clear that any alleged error with respect to the issue of waiver was not prejudicial and therefore does not warrant reversal of the judgment. (Cal. Const., art. VI, § 13; see *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; cert. den. (1957) 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].)

Apart from the issue of waiver, the claims and defenses involved in Holz's action against U.S.F. & G. were identical to those involved in Holz's action against Star. In instructing the jury on waiver, the trial court specifically informed them that this issue did not apply to defendant Star. Since the jury returned its verdict in Holz's favor against *both* defendant insurance companies, they necessarily found that Holz did not breach the automatic sprinkler warranty as interpreted by the trial court. (See fn. 13, *supra.*) Thus, in order to find U.S.F. & G. liable to

---

west or the east side. Joseph knew that stock was being stored in Building No. 5 and that Holz was reporting stock located anywhere on the premises without specific building designation, as per his instructions. Holz was told to specifically report values for different locations only when it wished to cover stock situated somewhere other than Lodi. This occurred on several occasions, when Holz had stock in Los Angeles, Stockton and Oakland.

[20]With respect to waiver, the trial court instructed the jury as follows:

"Evidence has been received showing that U.S.F. & G. Company may have acquired knowledge before the fire and after its policies were written, that a new, unsprinklered building had been erected on the premises of the HOLZ RUBBER COMPANY and certain other facts. Whether or not this constitutes knowledge on their part of the use of such new building for the storing of stock, and the acquiescence in such use, is a question of fact for you to decide. If you find in the affirmative that U.S.F. & G. had such knowledge and did so acquiesce then you may consider this as a waiver of the sprinkler warranty.

"*You are further instructed that this does not apply to defendant* AMERICAN STAR INSURANCE COMPANY.

"The plaintiffs have the burden of proving the existence of a waiver." (Italics added.)

Holz under the policy, it was not necessary for the jury to reach the waiver issue. Hence, any error did not influence the verdict in favor of Holz and against U.S.F. & G. and therefore was not prejudicial.

3. *Appeal of cross-defendants Elson and Joseph from that portion of the judgment against them and in favor of Star on its cross-complaint for indemnity.*

 Elson and Joseph were held liable to Star on its cross-complaint for indemnity on the theory that as agents for Star they were negligent in failing to disclose to their principal the material fact that Holz had constructed a new building on the premises covered by the policy and had stored stock in it prior to the installation of sprinklers. They raise five contentions in attacking the judgment. We need consider only one, since our decision on the issue thus raised entitles Elson and Joseph to judgment in their favor as a matter of law.

These parties assert that the verdict for Holz in its action against Star in effect constituted a finding of no negligence on their part toward their principal. They base this argument on the fact that in finding for Holz, the jury necessarily determined that its conduct in storing stock in the unsprinklered building did not breach the sprinkler warranty and did not increase the hazard.[21] Therefore, they argue, Holz's conduct was simply one of the risks covered by the policy of which they were not obligated to inform the insurer. We agree.

It is undisputed that an insurance agent acting for the insurer is under a duty to inform his principal of all matters material to the risk. (4 Couch on Insurance (2d ed. 1960) § 26:346, pp. 290-291.) However, as we have explained, under the policy issued by Star, Holz was permitted to store stock in Building No. 5 pending the installation of sprinklers. Therefore, there is no evidence supportive of the implied finding that Elson and Joseph were negligent in failing to inform Star of the above circumstances.

4. *Appeal of cross-complainant U.S.F. & G. from that portion of the judgment in favor of cross-defendants Elson and Joseph on U.S.F. & G.'s cross-complaint for indemnity.*

In appealing from that portion of the judgment in favor of Elson and Joseph and against U.S.F. & G. on its cross-complaint for indemnity,

---

[21]See footnote 13, *supra.*

U.S.F. & G. argues that the trial court committed prejudicial error in two instances in instructing the jury. First, U.S.F. & G. reasserts its claim that the court erred in instructing the jury on the insurer's waiver of the alleged breach of the sprinkler warranty.[22] Second, U.S.F. & G. claims that the trial court gave an erroneous and misleading instruction on the question of an agent's duty to his principal in that the instruction raised issues as to which no evidence was presented and omitted the vital issue of the agent's negligence.[23]

Our resolution of Elson's and Joseph's appeal from that portion of the judgment against them and in favor of Star makes it unnecessary for us to determine the related point here. We have concluded that as a matter of law Elson and Joseph had no duty to advise Star that Holz was storing stock in Building No. 5 pending the installation of sprinklers. The scope of the agent's duty was identical with respect to both Star and U.S.F. & G. The judgment in their favor on U.S.F. & G.'s cross-complaint is therefore manifestly supported as a matter of law.

That portion of the judgment appealed from in favor of plaintiffs and against defendant American Star Insurance Company is affirmed. That portion of the judgment appealed from in favor of plaintiffs and against defendant U.S. Fidelity and Guaranty Company is affirmed. That portion of the judgment appealed from in favor of cross-complainant American Star Insurance Company and against cross-defendants Max Elson, doing business as Max Elson Insurance Company, and Bill Joseph is reversed, with directions to the trial court to enter a judgment in favor of said cross-defendants and against said cross-complainant. That portion of the judgment appealed from in favor of cross-defendants Max Elson, doing business as Max Elson Insurance Company, and Bill Joseph and against cross-complainant U.S. Fidelity and Guaranty Company is affirmed.

Plaintiffs shall recover their costs on appeal as against defendants American Star Insurance Company and U.S. Fidelity and Guaranty Company. Cross-defendants Max Elson, doing business as Max Elson

---

[22] See text accompanying footnote 20, *supra.*

[23] At the request of cross-defendant Elson, the court instructed the jury as follows: "An agent who contracts to perform personal service does not undertake to render perfect services, and mere errors in judgment not due to want of due care or due diligence, or to fraud or unfair dealing, are not actionable. An agent is not an insurer against losses due to honest mistakes or errors in judgment, and if he acts *in good faith* and with reasonable skill and diligence under all the circumstances, he will not be liable for losses which his principal sustains."

Insurance Company, and Bill Joseph shall recover their costs on appeal as against cross-complainants American Star Insurance Company and U.S. Fidelity and Guaranty Company.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Burke, J.* concurred.

The petition of appellant American Star Insurance Company for a rehearing was denied May 14, 1975. Richardson, J., did not participate therein.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.