[No. B001712. Second Dist., Div. Four. June 18, 1984.]

ANTONIO V. DELGADO, Plaintiff and Appellant, v.
HERITAGE LIFE INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

Lipsky & Blickenstaff, Shernoff, Lipsky & Blickenstaff, David I. Lipsky and Charlotte P. Sato for Plaintiff and Appellant.

Raitt, Dobrin & Seeley, G. Emmett Raitt, Jr., and Peter L. Colt for Defendant and Appellant.

**OPINION**

McCLOSKY, J.—Plaintiff Antonio V. Delgado appeals from "the order of nonsuit . . . in favor of defendant HERITAGE LIFE INSURANCE COMPANY against plaintiff on the issue of punitive damages on the cause of action for breach of the duty of good faith and fair dealing." Defendant Heritage Life Insurance Company (Heritage) cross-appeals from the "judgment . . . in favor of plaintiff . . . and against defendant Heritage . . . on the issue of interpretation of the insurance policy on the count for breach of the duty of good faith and fair dealing." That judgment after a trial by jury awarded plaintiff "[d]amages undert [*sic*] the insurance policy in the amount of $2,236.08 [and] [c]ompensatory damages in the amount of $900.00."

### CONTENTIONS

Heritage raises the following contentions on appeal:

"The trial court did not consider the purpose of the policy, or the reasonable expectations of the parties in making its determination of ambiguity.

"The insurance policy must be conclusively presumed to be unambiguous since it was approved by the insurance commissioner of the State of California.

"The 'process of nature rule' precludes recovery by appellant in this case.

"Appellant proved only that his disability manifested itself during the policy term."

Mr. Delgado raises the following contentions on appeal:

"A punitive damages instruction is proper if plaintiff has made a *prima facie* showing of malice, fraud or oppression.

"Delgado presented overwhelming evidence that his claim for credit disability benefits was handled fraudulently, maliciously, and oppressively in conscious disregard of his rights.

"The trial court applied the incorrect standard in determining whether to permit plaintiff to go to the jury on punitive damages regarding defendant's breach of its duty of good faith and fair dealing.

"The determination whether to award punitive damages was within the province of the jury."

## FACTS

On March 29, 1974, John Braca, a salesman for Leo Hoffman Chevrolet Corporation (hereafter Hoffman Chevrolet), sold plaintiff Antonio Delgado a car together with a three-year credit life and disability policy offered by defendant Heritage through Leo Hoffman Insurance Corporation (hereafter Hoffman Insurance).[1] The purpose of that policy was to insure the payments of the automobile loan in the event Mr. Delgado died or became disabled.

On October 30, 1975, Mr. Delgado was seriously injured while working at his job. In November 1975, the Delgados went to Hoffman Chevrolet to shop for a new car. Mr. Delgado's appearance reflected his recent accident. They encountered one Kurt Hoffman, an employee of Hoffman Insurance, who inquired into Mr. Delgado's condition. Mr. Delgado told him that he had been hurt in Washington.

On March 29, 1976, the Delgados returned to Hoffman Chevrolet, purchased a new car and traded in their 1974 car. Mr. Braca was again their salesman. The Delgados decided to subscribe to another credit life and disability policy with Heritage in connection with this purchase. Mr. Braca told the Delgados that they could transfer the remaining one year on their 1974 credit life and disability insurance to the insurance purchased for their 1976 car. Mrs. Delgado was skeptical about this and Mr. Braca took the Delgados to Mr. Hoffman to have this explained.

While the Delgados were in Mr. Hoffman's office, the application for the 1976 insurance policy was completed. Mrs. Delgado testified that Mr. Hoffman told her that all of the insurance on the 1974 car would be transferred to the 1976 car. Mr. Hoffman testified that he was not told of the Delgados' 1974 disability policy or he would have refunded the premiums for the one

---

[1]Mr. Delgado spoke primarily Spanish and Ms. Delgado acted as his interpreter for most of the transactions described herein.

year remaining on that policy. No refund of those premiums was ever made. Ms. Delgado assumed that the effective date of the 1976 policy would be upon the expiration of the 1974 policy.

In the process of completing the insurance application, Mr. Hoffman asked whether Mr. Delgado had consulted or been under the care of a doctor within the last six months for cancer or any disease or condition of the heart, liver, kidneys or lungs. Mr. Delgado responded that he had nothing like that wrong with him. Ms. Delgado testified that she told Mr. Hoffman about Mr. Delgado's October 1975 accident at that time. Mr. Hoffman did not recall this.

The 1976 policy provided in pertinent part: " 'Injury,' as used herein, means bodily injury, caused by an accident, occurring while this policy is in force, which causes the total disability of the Insured, as defined herein, resulting in loss of time commencing while this policy is in force. [¶] 'Sickness,' as used herein, means sickness or disease which causes the total disability of the Insured, as defined herein, resulting in loss of time commencing while this policy is in force. . . . [¶] EXCLUSIONS: This policy does not provide any benefits for total disability caused by or resulting from any of the following: (1) a preexisting illness, disease or physical condition for which medical advice, consultation or treatment was required or recommended within the six months preceding the taking of the application for this policy and for which medical advice, consultation or treatment was required or recommended within the six months following the effective date of this policy; (2) pregnancy, except miscarriage caused by accident; (3) intentionally self-inflicted injuries." This clause was known as, and will be referred to as, the six and six exclusion.

Mr. Hoffman did not recall explaining the six and six exclusion to the Delgados at the time they subscribed to the policy. Nor did the brochure which describes the policy explain this exclusion. Heritage's interpretation of that clause was that it excluded preexisting conditions as a result of an illness which had been treated within those times provided. The exclusion applied solely to illnesses such as malaria and not injuries such as a broken arm. Mr. Sklar and Mr. Crummey of Heritage, each testified that no preexisting injuries were covered under the 1976 policy. Mr. Crummey, the attorney who actually drafted the policy, also testified that the "six and six" exclusion applied only to sickness and not to accident. "Even though it says physical condition, people look at it in terms of illness as opposed to injury." The·Delgados testified that Mr. Hoffman explained only that the policy would provide coverage if plaintiff became very ill or died and that "we would not have anything to worry about."

In April 1977, Mr. Delgado submitted a claim under the 1976 policy for a disability caused by his October 1975 accident. He claimed that the injuries from that accident did not incapacitate him until January 1977. That claim provided in pertinent part:

"If accident, where and how did it occur? in Washington fell off beam

"If illness, when were symptoms first noticed? 1-18-77

"Have you been treated for this condition within 6 months BEFORE the effective date of your policy? __ Yes x No

"Have you been treated for this condition within 6 months AFTER the effective date of your policy? x Yes. __ No"

Sanford Sklar processed Mr. Delgado's claim for Heritage. On May 3, 1977, he sent Mr. Delgado a letter stating:

"Enclosed please find a copy of the check . . . for $355.63 as full and final payment for your disability from January 18, 1977, through March 29, 1977, the expiration date of policy C243353 [the 1974 policy]. No further benefits are due or payable under that policy. [¶] No benefits are payable under policy C347456 [the 1976 policy] as the accident for which you are now claiming benefits occurred prior to the issue date of the policy. The exception clause in your policy explains this. I'm sorry we cannot be of help in this matter. [¶] If you have any questions on the above, please do not hesitate to contact this office."

Mr. Sklar testified that Mr. Delgado's claim was inconsistent because it contained responses to questions dealing with both an accident and an illness. He did not think, however, that this inconsistency warranted an investigation of that claim and therefore none was made.

After the Delgados received the above letter, Mrs. Delgado twice telephoned Heritage in an attempt to get information regarding the rejection of the claim under the 1976 policy. On each occasion, she was told only that she would be called back but never was. After the second unsuccessful attempt to discuss their claim with Mr. Sklar, the Delgados retained an attorney who phoned Heritage and was explained its interpretation of the policy.

Thereafter, Mr. Delgado filed this action against Heritage, Hoffman Chevrolet and Kurt Hoffman for breach of duty of fair dealing and good

faith; fraud; breach of fiduciary duty (which cause of action was dismissed at trial) and breach of statutory duty.

In substance, that complaint sought to recover compensatory and punitive damages due to defendant's alleged failure to make payments under the 1976 policy, their failure to adequately investigate his claim, their failure to adequately explain their denial of that claim and their misrepresentations to plaintiff respecting the coverage under that policy. The jury returned a verdict for Mr. Delgado and against Heritage on his cause of action for breach of duty of good faith and fair dealing. It returned a verdict against Mr. Delgado on all other counts.

## THE HERITAGE CROSS-APPEAL

### I

Heritage first contends that "[t]he trial court did not consider the purpose of the policy, or the reasonable expectations of the parties in making its determinations of ambiguity."

At trial, after both parties rested, plaintiff moved the court to find as a matter of law that the 1976 policy provision defining injury is ambiguous when read in connection with the six and six exclusion section of that policy. Plaintiff argued that as a consequence of that ambiguity, the only preexisting conditions that were not covered under that policy were those that fell within the six and six exclusion.

The court granted plaintiff's motion, finding that the 1976 policy was ambiguous and that the ambiguity should be construed in favor of plaintiff as the insured. Consequently, the court instructed the jury that "it has concluded as a matter of law that the terms of the disability insurance, Exhibit 4, are ambiguous. You are instructed that the six and six provision of the exclusion clause does apply and that the injury definition clause insofar as it might preclude coverage does not apply."

■ The determination of whether an ambiguity exists in a contract is one of law and the trial court's ruling is not binding on an appellate court. (*Harabedian* v. *Zurich Ins. Co.* (1963) 218 Cal.App.2d 702, 705 [32 Cal.Rptr. 813]; see *Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 314 [195 Cal.Rptr. 90].) Moreover, it is strictly a judicial function unless the interpretation turns on the credibility of extrinsic evidence. In urging that the substantial evidence standard of review is applicable, plaintiff confuses the determination of whether an ambiguity exists in a policy with the interpretation of that policy in light of conflicting

parole evidence once an ambiguity has been found. (*Harabedian* v. *Zurich Ins. Co., supra,* 218 Cal.App.2d 702, 705.) In the case at bench, the trial court's ruling concerns only the former. Merely because there was conflicting testimony at trial as to what a reasonable interpretation of the policy would be does not in itself create a factual question, it serves only to highlight the potential ambiguity in that policy.

■ "A policy provision is ambiguous when it is capable of two or more different constructions, both of which are reasonable." (*Rullman* v. *State Farm Mut. Automobile Ins. Co.* (1970) 8 Cal.App.3d 606, 609 [87 Cal.Rptr. 551].) ■ "An insurance policy, like any other contract, must be construed as an entirety, with each clause lending meaning to the other." (*Holz Rubber Co., Inc.* v. *American Star Ins. Co.* (1975) 14 Cal.3d 45, 56 [120 Cal.Rptr. 415, 533 P.2d 1055, 79 A.L.R.3d 518].) ■ An ambiguity in a policy results when "there is contradictory or necessarily inconsistent language in different portions of the instrument; . . ." (13 Appleman, Insurance Law and Practice (1976) General Principles, § 7386, p. 161.)

■ "Words used in a policy of insurance are to be interpreted according to the plain meaning which a layman would ordinarily attach to them, that is, ' "the policy should be read as a layman would read it and not as it might be analyzed by an attorney or an insurance expert." ' (*Otter* v. *General Ins. Co.* (1973) 34 Cal.App.3d 940, 949 [109 Cal.Rptr. 831].) ■ '[A]ny ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates.' (*Harris* v. *Glens Falls Ins. Co.* (1972) 6 Cal.3d 699, 701 [100 Cal.Rptr. 133, 493 P.2d 861].)" (*McBride* v. *Farmers Ins. Group* (1982) 130 Cal.App.3d 258, 260-261 [181 Cal.Rptr. 539]; see also *Ponder* v. *Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 727 [193 Cal.Rptr. 632].)

This is particularly true with respect to policy provisions which limit insurance coverage. Because of the superior bargaining power of the insurer, exceptions and exclusions in the insurance policy are strictly construed against the insurer and liberally interpreted in favor of the insured. (*Healy Tibbitts Constr. Co.* v. *Employers' Surplus Lines Ins. Co.* (1977) 72 Cal.App.3d 741, 749 [140 Cal.Rptr. 375, 97 A.L.R.3d 1258].) This superior bargaining power has been expressly recognized in the marketing of credit disability and life insurance. (Cal. Admin. Code, tit. 10, § 2248, subd. (d).)

The subject policy insured against "loss of time caused by injury or sickness as defined herein." Injury is defined in the policy as a "bodily injury,

caused by an accident, occurring while this policy is in force, which causes the *total disability* of the Insured, as defined herein, resulting in loss of time commencing while this policy is in force."[2] The alleged ambiguity results from reading this definition with the six and six exclusion: "EXCLUSIONS: This policy does not provide any benefits for total disability caused by or resulting from any of the following: (1) a pre-existing illness, disease or *physical condition* for which medical advice, counsultation or treatment was required or recommended within the six months preceding the taking of the application for this policy and for which medical advice, consultation or treatment was required or recommended within the six months following the effective date of this policy; (2) pregnancy, except miscarriage caused by accident; (3) intentionally self-inflicted injuries." (Italics added.) Heritage asserts that this provision applies only to limit the recovery for a preexisting sickness and has no application to injuries because all preexisting injuries are excluded pursuant to the policy's definition of that term.

The term "physical condition" used in the exclusions clause appears neither in the definition of sickness or injury. The insurer's interpretation of the term "physical condition" does not comport with ordinary English usage. An insured reading this policy as a layman, might reasonably conclude that "bodily injury," as that term is used in the injury definition, is synonomous with a "physical condition."[3] Consequently, that insured could further conclude from the six and six exclusions' clause, that a preexisting physical condition such as a bodily injury, which did not fall within the six and six exclusion would be covered.

Heritage urges that because the physical condition language is placed in the exclusions section of the policy, it cannot be used to expand the scope of coverage under that policy. That is not the question. An insurance policy is viewed from the perspective of a reasonable layman. Upon our independent examination of the subject policy, we conclude that a reasonable layman could interpret that policy to exclude only those preexisting injuries that fall within the six and six exclusion. This interpretation is buttressed by the insurance commissioner's regulations in effect at the time the subject policy was drafted and issued. Those regulations each provide: "A credit disability insurance policy violates this subsection if it: excludes coverages for preexisting conditions other than those for which medical advice, consultation or treatment was required or recommended within six months preceding the taking of the application for insurance and for which medical

---

[2]Sickness is defined as: "[S]ickness or disease which causes the total disability of the Insured, as defined herein, resulting in loss of time commencing while this policy is in force."

[3]This is at least as reasonable as Heritage's interpretation of physical condition which is "an undiagnosed or undetermined illness or disease."

advice, consultation or treatment was required or recommended within the six months following effective date of the insurance coverage; . . ." There is no distinction made in these regulations between a disability resulting from a preexisting condition caused by an injury or one caused by a sickness. Also, the Spanish language brochure provided the insured at the time he applied for the subject policy provides:

"Q. Even if I am incapacitated, is there an occasion in which I will not receive payments?

"Yes, when you are incapacitated because of:

"1. A pre-existing physical condition for which medical attention is required or is recommended, six months before and six months after the date of your policy." This brochure uses "physical condition" as a generic term covering all exclusions under the policy and draws no distinction between accident and sickness. Therefore, it would seem that a reasonable lay insured would also not draw a distinction.

## II

■ ■■■ Heritage next contends that "the insurance policy must be conclusively presumed to be unambiguous since it was approved by the insurance commissioner of the state of California."[4] Heritage bases this contention upon the application of Insurance Code section 10291.5, subds. (b)(1) and 13(i)[5] which we shall hold are not applicable to the case at bench.

Section 779.1 et seq. (div. 1, pt. 2, art. 5.9), specifically regulates credit disability and life insurance. Within this article, section 779.10 provides: "The provisions of Sections 10290 and 10291 relating to the filing, approval and disapproval of disability policy forms shall be applicable to forms, whether of life or disability insurance, required by this article to be filed with or approved by the commissioner." Sections 10290 and 10291, which are contained in the article dealing with general disability policies, require that certain information be filed by insurance companies with the commissioner prior to the issuance of a disability insurance policy and also provide the methods of approval or disapproval by the commissioner.

Defendant urges that the incorporation of those sections into article 5.9 necessitates the incorporation of section 10291.5 into that article because

---

[4]The record on appeal does not reflect that Heritage raised this point in the trial court. Because it is purely a legal issue which both parties have addressed on the merits we too consider it on the merits. (See *Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].)

[5]Unless otherwise specified, all further statutory references will be to the Insurance Code.

that section provides the criteria the commissioner is to use in deciding whether to approve a policy. Section 10291.5, subdivision (b)(1) provides that ambiguities in a policy are grounds for the rejection of that policy. Subdivision 13(i) provides in pertinent part that "[a]ny such policy issued by an insurer to an insured on a form approved by the commissioner, . . . shall, as between the insurer and the insured, . . . be conclusively presumed to comply with and conform to the provisions of this section." Based upon these provisions Heritage urges that once a credit disability policy is approved by the commissioner it is conclusively presumed to be unambiguous.

■ This contention fails to recognize the selective nature of the incorporation of the provisions dealing with the general disability insurance (§ 10270 et seq.) into the article dealing specifically with credit life and disability insurance. That is evidenced by section 779.11 which provides that "[t]he provisions of subdivision (d) and (e) of Section 10291.5 shall be applicable to the withdrawal of the approval of forms, whether of life or disability insurance, required by this article to be filed with or approved by the commissioner." Had the Legislature intended to also incorporate section 10291.5, subdivisions (b)(1) and 13(i) it would have specifically done so. Absent that incorporation, we conclude that those subdivisions have no application to a credit disability and life policy. We reject Heritage's contention to the contrary.

### III

Heritage next contends that "[t]he 'process of nature rule' precludes recovery by appellant" in this case. ■ "The 'process of nature' rule holds that, within the meaning of policy provisions requiring disability within a specified time after the accident, the onset of disability relates back to the time of the accident itself whenever the disability arises directly from the accident 'within such time as the process of nature consumes in bringing the person affected to a state of total [disability].' (*Schilk* v. *Benefit Trust Life Ins. Co.* (1969) 273 Cal.App.2d 302, 307 [78 Cal.Rptr. 60, 39 A.L.R.3d 1019].)" (*Willden* v. *Washington Nat. Ins. Co.* (1976) 18 Cal.3d 631, 635 [135 Cal.Rptr. 69, 557 P.2d 501].) The purpose of this rule is to prevent insurers from enforcing arbitrary limitations on coverage. (18 Cal.3d at p. 635.) It may not be applied to defeat an insured's reasonable expectation that his preexisting injury would be covered. This would serve only to create an arbitrary limitation. We, therefore, reject Heritage's contention.

### VI

Heritage's final contention is that appellant proved only that his disability manifested itself during the policy term and is, therefore, not covered. This

contention ignores the fact that despite the relationship of plaintiff's disability to an event occurring prior to the effective date of the policy, the plaintiff's reasonable expectations were that that disability would be covered as long as its inception was not within the six and six exclusion. We, therefore, reject this contention as meritless.

PLAINTIFF'S APPEAL

Plaintiff contends that "[a] punitive damages instruction is proper if plaintiff has made a *prima facie* showing of malice, fraud or oppression." At the completion of plaintiff's case in chief, he moved to introduce into evidence the "Department of Insurance filing from Heritage Life Insurance Company as to their financial condition and also a statement of the financial condition of Kurt Hoffman Chevrolet [*sic*]." Defendants objected asserting that plaintiff had not made a prima facie case for the award of punitive damages and, therefore, that evidence was inadmissible. (Civ. Code, § 3295, subd. (a).) The court allowed the admission of that evidence for the limited purpose of the fraud cause of action but ruled that "there is no basis upon which to give an instruction on punitive damages with respect to the breach of the implied duty of good faith and fair dealing." This ruling essentially amounted to the granting of nonsuit as to the issue of the recovery of punitive damages for that cause of action. (Code Civ. Proc., § 581c, subd. (b).) "A nonsuit may be granted only where, disregarding conflicting evidence on behalf of defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff (*O'Keefe* v. *South End Rowing Club* 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]). Neither the appellate court nor the lower court may weigh the evidence or consider the credibility of the witnesses (*Lasry* v. *Lederman,* 147 Cal.App.2d 480 [305 P.2d 663])." (*Morgenforth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 530 [126 Cal.Rptr. 681].)

The recovery of punitive or exemplary damages is governed by Civil Code section 3294 which in pertinent part provides: "(a) In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [¶] . . . . [¶] (c) As used in this section, the following definitions shall apply: [¶] (1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means subjecting a person to cruel

and unjust hardship in conscious disregard of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

 " '[W]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' " (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141], app. dism., *Mutual of Omaha Insurance Co.* v. *Egan* (1980) 445 U.S. 912 [63 L.Ed.2d 597, 100 S.Ct. 1271], citing *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 400-401 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) The terms "bad faith" and "good faith" as used in the context of determining a tortious breach of an insurance contract "are not meant to connote the absence or presence of positive misconduct of a malicious or immoral nature—considerations which . . . are more properly concerned in the determination of liability for *punitive* damages. [Within this context they] deal only with the question of breach of the implied covenant and the resultant liability for *compensatory* damages. As stated by the draftsmen of the Restatement of Contracts, '[t]he phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat in the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes [from consideration] a variety of types of conduct characterized [in other contexts] as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.' (Rest.2d Contracts (Tent. Draft Nos. 1-7) § 231, comm. a.)" (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921-922 [148 Cal.Rptr. 389, 582 P.2d 980], fn. 5; italics in original.)

In order to justify an award of punitive damages the plaintiff must establish that beyond the insurer's bad faith breach of an insurance contract, it acted "with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights." (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688 [201 Cal.Rptr. 528].) "It is not necessary, however, that defendant's motivation and intent be proved by direct evidence; it is sufficient that there is indirect evidence from which the jury could draw inferences." (*Austero* v. *Washington National Ins. Co.* (1982) 132 Cal.App.3d 408, 418 [182 Cal.Rptr. 919]; *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854].)

Because there is no evidence from which the jury could infer, Heritage intended to cause injury to Mr. Delgado, the determination of whether Her-

itage acted maliciously or oppressively with respect to Mr. Delgado, turns on whether its actions were taken with a conscious disregard of his rights. "In order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences." (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890, 895-896.)

Heritage urges that in order to satisfy this standard it is necessary for an insured to prove that the insurer was aware of the impact its denial of a claim would have on that particular insured. We disagree.

When a person buys disability insurance "[t]he very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity." (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 404; see also *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 820-821; but see *Beck* v. *State Farm Mut. Auto. Ins. Co.* (1976) 54 Cal.App.3d 347, 356 [126 Cal.Rptr. 602].) This is not to say that such evidence is irrelevant to a determination of whether punitive damages are warranted. Clearly an insurer's actual knowledge that its wrongful denial of a claim will have a particularly harsh impact on its particular insured clearly demonstrates the culpability of that insurer. (See *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.2d 809, 822; *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 918-919; *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 389; *Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 794 [121 Cal.Rptr. 200].)

The breach of the covenant of good faith and fair dealing in the context of disability insurance does not, however, automatically warrant the imposition of punitive damages. To justify an award of punitive damages, the insured must still establish that the insurer acted with the requisite quality of intent to award punitive damages. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 922; *Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452, 462.) To satisfy this requirement, the insured must prove that the insurer wilfully and deliberately failed to take the steps necessary to avoid the adverse consequences that the unwarranted denial of its claim would have.

In the case at bench Heritage interpreted its ambiguous policy to exclude coverage. That interpretation was not inherently unreasonable and is not, therefore, conclusive evidence of its bad faith. (*Mason* v. *Mercury Cas. Co.* (1976) 64 Cal.App.3d 471, 475 [134 Cal.Rptr. 545].) Heritage,

however, also interpreted the ambiguous claim form submitted by Mr. Delgado in a restrictive manner. It twice failed to respond to inquiries by its insured regarding the rejection of his claim and it failed to conduct any investigation into the validity of that claim.[6] This evidence in combination is of sufficient substantiality to support a finding by the jury that Heritage wilfully and deliberately failed to avoid the adverse consequences of its wrongful denial of Mr. Delgado's claim.

Contrary to Heritage's contention the fact that the form upon which the 1976 policy was based, was drafted by an attorney for Heritage and was approved by the Commissioner of Insurance does not conclusively establish that it acted in good faith in handling Mr. Delgado's claim. The record is devoid of any evidence that the manner in which Heritage handled Mr. Delgado's claim was on the advice of counsel. (See *Beck* v. *State Farm Mut. Auto. Ins. Co., supra,* 54 Cal.App.3d 347, 356.)

We, therefore, conclude that there was sufficient evidence demonstrating that Heritage acted with a conscious disregard of Mr. Delgado's rights to submit the issue of his entitlement to punitive damages to the jury. The trial court committed reversible error by preventing him from doing so. Since the jury properly decided the fraud issue adversely to appellant, no new trial is required or would be proper based on the fraud allegations or any right to punitive damages based thereon. The instruction given to the jury for Mr. Delgado's fraud cause of action concerns substantially the same conduct and, therefore, that issue has already been considered and rejected by the jury.

That portion of the judgment denying punitive damages to plaintiff Antonio V. Delgado on the cause of action for breach of the duty of good faith and fair dealing is reversed and the matter is remanded to the trial court for a new trial on that issue alone. In all other respects, the judgment is affirmed. Defendant Heritage Life Insurance Company is to pay costs.

Kingsley, Acting P. J., and Munoz, J.,* concurred.

A petition for a rehearing was denied July 9, 1984, and the petition of defendant and appellant for a hearing by the Supreme Court was denied August 15, 1984.

---

[6]Contrary to Mr. Delgado's contention, Heritage's actions with regard to the 1974 policy cannot be the basis of an award of punitive damages as his claim under that policy was paid.

*Assigned by the Chairperson of the Judicial Council.