**SEMINIS, INC., Plaintiff,**

v.

**FACTORY MUTUAL INSURANCE COMPANY, Defendant.**

**Case No. CV 07–1979 GAF (FMOx).**

United States District Court, C.D. California.

Aug. 7, 2008.

Daniel H. Rylaarsdam, Linda D. Kornfeld, Dickstein Shapiro, Los Angeles, CA, for Plaintiff.

David E. Bland, James P. Koelzer, Robins Kaplan Miller & Ciresi, Los Angeles, CA, Scott G. Johnson, Robins Kaplan Miller & Ciresi, Minneapolis, MN, for Defendant.

## MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GARY ALLEN FEESS, District Judge.

## I.

## INTRODUCTION

Plaintiff Seminis, Inc., a producer of vegetable seeds for professional growers, conducts business in over 30 countries, including the operation of a research and development facility in Nimes, France. To protect its investment in its worldwide facilities, Seminis purchased policies of insurance, including policies from Defendant Factory Mutual Insurance Company ("Factory Mutual"). When the Nimes research facility suffered substantial flood damage during a severe storm in September 2005, Seminis made a claim under the Factory Mutual insurance policy. When Factory Mutual rejected the claim, Seminis brought this lawsuit seeking declaratory relief, compensatory damages, and punitive damages due to Factory Mutual's alleged tortious breach of the covenant of good faith and fair dealing.

Factory Mutual has filed the instant motion for partial summary judgment on the grounds that the insurance policy excludes coverage for "growing crops, except live plants in controlled greenhouses at Insured Locations." (Casillas Decl., Ex. A [Policy] at bates stamp SEM 00367 [Growing Crops Exclusion].) While the policy does not define the term "growing crops," Factory Mutual asserts that the policy excludes insurance coverage for those plants that were not in controlled greenhouses (i.e., those plants that were growing in the open fields, or "Open Field Plants"). Factory Mutual reaches this conclusion: (1) based on the plain, unambiguous meaning of the term "growing crops"; and (2) because the policy gives back coverage only for "live plants in controlled greenhouses." On these grounds, Factory Mutual seeks partial summary judgment on the issue that the policy does not cover damage to the Open Field Plants at the Nimes facility.

Seminis opposes the motion on the ground that the term "growing crops" is not defined in the policy and the term is subject to more than one reasonable interpretation. Seminis argues that based on dictionary definitions, statutes, case law, and industry usage, the term "crop" is limited to plants that are harvested and sold *for profit.* Because the Open Field Plants were grown strictly for research and development, Seminis claims that they cannot be considered "crops" or, at the very least, there are two reasonable interpretations of the phrase "growing crops." Because, Seminis argues, the contract term "growing crops" is ambiguous, the ambiguity should be construed against the party who caused the ambiguity to exist, Factory Mutual, and summary judgment on this issue must be denied.

For the reasons discussed in greater detail below, the Court **GRANTS** Factory Mutual's motion for partial summary judgment. While it is undisputed that the term "growing crops" is not defined in the policy, the Court concludes that based on the ordinary and popular meaning of those words, the term "crops," which is the term actually in dispute in this case: (1) means cultivated agricultural plants whether or not grown for profit; and (2) includes the Open Field Plants. Moreover, because the term is not ambiguous (the usual meaning of the term being reflected in Seminis's own internal documents), the term need not be construed against the insurer, Factory Mutual.

## II.

## STATEMENT OF FACTS

### A. *The Nature of Seminis's Business*

Seminis develops, produces, and markets open pollinated and hybrid vegetable seeds for professional growers. (Statement of Genuine Issue ("SGI") ¶ 1.) Seminis has its headquarters in Oxnard, California and has facilities in 30 countries which assist Seminis in developing, producing, and selling its seeds worldwide. (SGI ¶ 2.)

At its facility in Nimes, France, Seminis performs research and development activities with respect to certain types of vegetable seeds, including lettuce, carrots, cucumbers, and others. (SGI ¶ 3.) The Nimes facility includes, among other things, numerous greenhouses and open fields in which Seminis grows vegetables. (SGI ¶ 4.)

### B. *The Insurance Policy Between Seminis and Factory Mutual*

Factory Mutual Insurance Company provided property insurance to Seminis for the policy period October 1, 2004 to October 1, 2005 (the "UB 220 Policy" or the "Policy"). (SGI ¶ 5; *see also* Casillas Decl., Ex. A [UB 220 Policy].) The Policy

issued to Seminis included the following provision:

PROPERTY DAMAGE—SECTION B

. . .

2. PROPERTY EXCLUDED

This Policy *excludes:*

C. animals, standing timber, *growing crops, except live plants in controlled greenhouses at Insured Locations.*

(SGI ¶ 6 (emphasis added); *see also* Casillas Deck, Ex. A [UB 220 Policy] at bates stamp SEM 00367.)

### C. *Flood Damage to Seminis's Nimes Facility*

As the result of extreme weather prior to and on September 6, 2005, Seminis suffered damage at its Nimes, France facility from flood waters that entered the facility. (SGI ¶ 7.) The flood damaged carrot, cucumber, melon, and lettuce plants that were being grown both in *and outside of* controlled greenhouses. (SGI ¶ 8.)

### D. *Emails From Seminis Employees Referring to Flood Damage and "Crops"*

On September 7, 2005, Seminis' Nimes facility manager, Carl Rentes, sent an internal email that stated as follows:

"During the next days we will try to limit the damage and pending the weather conditions in the next days we hope to be able to clean and dry the tunnels/ greenhouses in order to safe [sic] the *crops.*"

(SGI ¶ 9 (emphasis added).)

On September 9, 2005, Seminis' breeder Toon van de Ven sent an email to other Seminis breeders that stated:

"The insurance company will need to have the information what the direct and indirect damage to Seminis is. I think the direct damage can be estimated pretty quick. The indirect damage is more difficult to handle. In order to get

some information I would like you to address answers to Carl and Gildas for at least the following questions:

—How much area for your *crop* is damaged? *Was this area Greenhouse or Open field?*

—Does the flooding have impact on the planning of your *crop* for off station trials in France or abroad? . . ."

(SGI ¶ 10 (emphasis added).)

On September 16, 2005, Carl Rentes sent an email to Factory Mutual that stated: "We are monitoring the *crops* which 'survived' and will be able only after the growing cycle to know the final damage or material lost." (SGI ¶ 11 (emphasis added).)

### E. SEMINIS SEEKS COVERAGE FOR PLANTS DAMAGED IN ITS OPEN FIELDS; FACTORY MUTUAL ASSERTS THE "GROWING CROPS" EXCLUSION BARS RECOVERY

Seminis seeks coverage for damage to its plants that were grown inside controlled greenhouses and in the open fields. (SGI ¶ 12.) Seminis submitted a sworn proof of loss letter to Factory Mutual on February 13, 2007 in which it made a claim for damage to carrot, cucumber, lettuce, and melon plants. (SGI ¶ 16; Casillas Decl., Ex. C [Proof of Loss Letter].)

### III.

### ANALYSIS

### A. THE LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, when addressing a motion for summary judgment, this Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See id.* at 256, 106 S.Ct. 2505. Where there is no evidence demonstrating the existence of a genuine issue of material fact, the moving party may prevail simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. THE LEGAL STANDARD FOR CONSTRUING INSURANCE CONTRACTS

#### 1. GENERAL PRINCIPLES GOVERNING INSURANCE CONTRACTS

"A contract must be [ ] interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ.Code § 1636; *see also AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 821–22, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990) ("Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation."). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU,* 51 Cal.3d at 822, 274 Cal. Rptr. 820, 799 P.2d 1253 (*citing* Cal. Civ. Code § 1639). Moreover, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ.Code § 1641.

#### 2. LAY INTERPRETATION GOVERNS

▮ "Words in an insurance policy are ordinarily to be interpreted as a lay-

person would interpret them, that is, in their ordinary and popular sense." 2 Witkin, *Summary of California Law* ("*Witkin*") § 56 ["Lay Interpretation Governs"] (10th ed. 2005) (*citing Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 807, 180 Cal.Rptr. 628, 640 P.2d 764 (1982)). "A policy should not be read as it might be analyzed by an attorney or an insurance expert." 2 *Witkin* § 56 (*citing Delgado v. Heritage Life Ins. Co.,* 157 Cal.App.3d 262, 271, 203 Cal.Rptr. 672 (Ct.App.1984)). This is true even if the policyholder is a sophisticated insured. *Id.* (*citing AIU,* 51 Cal.3d at 823, 274 Cal.Rptr. 820, 799 P.2d 1253). "This rule applies unless it is obvious that the term was used in a technical sense, or that a special meaning is given to the term by usage." 2 *Witkin* § 56 (*citing Havstad v. Fidelity Nat'l Title Ins. Co.,* 58 Cal. App.4th 654, 660, 68 Cal.Rptr.2d 487 (Ct. App.1997)); *see also AIU,* 51 Cal.3d at 822, 274 Cal.Rptr. 820, 799 P.2d 1253 ("The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' *unless* 'used by the parties in a technical sense or a special meaning is given to them by usage'" controls) (*quoting* Cal. Civ.Code §§ 1644, 1638) (emphasis added).[1]

**3. INSURANCE COVERAGE IS TO BE INTERPRETED BROADLY WHILE EXCLUSIONARY CLAUSES ARE INTERPRETED NARROWLY**

■ However, "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins., Exchange,* 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003) (*citing White v. Western Title Ins. Co.,* 40 Cal.3d 870, 881, 221 Cal.Rptr.

509, 710 P.2d 309 (1985)) (internal quotation marks and alterations omitted).

**4. CONTRACT AMBIGUITIES**

■ "The terms of a policy must be determined in context. The language must be construed in the light of the instrument as a whole, and in the circumstances of the case. Thus, the mere fact that a word or phrase in a policy *may have* multiple meanings when considered in the abstract, does not create an ambiguity." 2 *Witkin* § 57 (*citing, inter alia Bay Cities Paving & Grading v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993) (emphasis added)). Furthermore, although coverage exclusions are strictly construed, courts "may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid." *Suarez v. Life Ins. Co. of N. Am.,* 206 Cal. App.3d 1396, 1403, 254 Cal.Rptr. 377 (Ct. App.1988) (citation omitted).

■ "[I]f the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning." *AIU,* 51 Cal.3d at 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (citations omitted). However, "[a] policy provision is ambiguous when it can have two or more reasonable constructions." *Safeco Ins. Co. of Am. v. Robert S.,* 26 Cal.4th 758, 763, 110 Cal.Rptr.2d 844, 28 P.3d 889 (2001) (*citing Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995)). "If there is ambiguity, [ ] it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation." *AIU,* 51 Cal.3d at 822, 274 Cal.Rptr. 820,

---

**1.** "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." Cal. Civ. Code § 1645.

799 P.2d 1253 (*citing* Cal. Civ.Code § 1649).

■ "If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist." *AIU*, 51 Cal.3d at 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (*citing* Cal. Civ.Code § 1654). "in the insurance context, we generally resolve ambiguities in favor of coverage." *Id.* (citations omitted); *see also Kazi v. State Farm Fire & Cas. Co.*, 24 Cal.4th 871, 879, 103 Cal.Rptr.2d 1, 15 P.3d 223 (2001) ("Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations.").

## C. ANALYSIS

### 1. THE MUTUAL INTENT OF THE PARTIES

It is undisputed that the term "growing crops" is not defined in the Policy. The parties do not dispute that the Open Field Plants were "growing" in the fields. Rather, the real dispute is over what the term "crops" means. The Court concludes, for the reasons discussed below, that the mutual intent of the parties can be gleaned from looking at the written provisions of the Policy, *AIU*, 51 Cal.3d at 822, 274 Cal.Rptr. 820, 799 P.2d 1253, and by taking the whole of the contract together, giving effect to each part. *See* Cal. Civ. Code § 1641.

The "growing crops" exclusion provides that "[t]his Policy excludes: ... growing crops, *except live plants* in controlled greenhouses at Insured Locations." (Casillas Decl., Ex. A [Policy] at bates stamp SEM 00367 (emphasis added).) The Policy also included a $2.5 million limitation on liability for "*[l]ive plants* in controlled

greenhouses at insured Locations." (*Id.* at SEM 00359 (emphasis added).) Reading the "growing crops exclusion" together with the $2.5 million limitation on liability provision confirms Factory Mutual's position that the parties intended to provide coverage for one type of "live plant"—that is, those "live plants in controlled greenhouses at Insured Locations." (*See id.* at SEM 00367, SEM 00359.) Accordingly, Seminis's position—that "crops" means "plants that are grown and harvested *to be sold* " (Opp. at 1 (emphasis in original))—is not supported by the above Policy provisions.

Furthermore, even if Seminis's proffered definition were used, the Open Field Plants could still be considered "crops" because even if they were not themselves sold for profit, Seminis cultivated the soil, planted and tended its fruit and vegetable produce, and harvested that produce at the end of the growing season for the very purpose of developing higher quality seed that it would then market with the objective of turning a profit. The carefully tended plants grown at the Seminis facility constitutes a "crop" in the most fundamental sense of that term. Indeed, Seminis's definition of "crop" would improperly read the "growing crops" exclusion out of the insurance contract and would improperly expand coverage to include risks that Factory Mutual did not bargain for. Cal. Civ. Code § 1641; *Suarez*, 206 Cal.App.3d at 1403, 254 Cal.Rptr. 377. Accordingly, if the term "crop" was given Seminis's proffered meaning—to exclude plants that were grown to be harvested and *sold*—this provision would not exclude any coverage at all.[2] The applicable rules of contract interpretation do not permit such a result.

---

**2.** On a related note, Factory Mutual points out that Seminis's proffered definition—that a crop must be sold and that the Open Field Plants are not "crops"—seemingly contradicts its earlier litigation position, in a February 13, 2007 proof of loss letter sent by Seminis to Factory Mutual, Seminis characterized

some of its Open Field Plants as both "R & D Material" (second heading listing carrots, cucumbers, lettuce, melons (breeding), melons (biotech)) *and* as "Gross Earnings Loss" (fifth heading listing carrots, cucumbers, lettuce (ABE), lettuce (Field), and melon). (Casillas

## 2. THE CONTRACT TERM IS NOT AMBIGUOUS

■ Furthermore, the term "growing crops" is not ambiguous. The term, as used in its ordinary and popular sense, clearly covers the Open Field Plants as excluded from coverage. This conclusion is supported by dictionary definitions, case law, and statutes, all of which suggest that Seminis's alternate definition is strained and unreasonable. That the term "growing crops" may have multiple meanings when considered in the abstract, does not create an ambiguity. 2 *Witkin*, § 57 (*citing Bay Cities*, 5 Cal.4th at 867, 21 Cal. Rptr.2d 691, 855 P.2d 1263).

### a. Dictionary Definitions

Seminis argues that dictionary definitions of "crop" require that plants be sold for profit. (*See* Opp. at 8–9.) Factory Mutual, however, correctly points out that: (1) several of the dictionaries used by Seminis are technical dictionaries and courts are to consider general dictionaries to ascertain the plain and ordinary meaning of undefined terms (*see* Reply at 4 (citing *Scott v. Cont'l Ins. Co.*, 44 Cal.App.4th 24, 29, 51 Cal.Rptr.2d 566 (Ct.App.1996))); and (2) those definitions that include the provision that a plant be harvested for sale do not require that plants be grown for that purpose. (*See* Reply at 5–6.) That is, while some dictionary definitions make reference to "crops" as being plants that are harvested and sold, none of the definitions proffered by Seminis *require* that that be

the case. In any event, the Court considers the definition set out in the American Heritage Dictionary which defines "crops" as "cultivated plants or agricultural produce" to express the generally understood meaning of the term, which does not include the requirement that the cultivated plants or produce be sold for a profit. Even backyard tomato plants yield a crop though most never see the marketplace.

### b. Case Law

Furthermore, case law supports Factory Mutual's position that the Open Field Plants are "growing crops." *Gerawan Farming Partners, Inc. v. Westchester Surplus Lines Ins. Co., et al.*, CIV F 05–1186 AWI DLB, 2008 WL 80711, at 17, 2008 U.S. Dist. LEXIS 4511, at *53 (E.D.Cal. Jan. 8, 2008) (Ishii, J.) is particularly helpful. (*See* Opp., Compendium of Authority, Ex. 1 [*Gerawan* printout].) in *Gerawan*, the court needed to define the term "growing crops." While the present case focuses on the term "crop," in *Gerawan* the point of contention was over the word "growing." [3] In any event, the court used the ordinary and popular meaning of the term "growing crops" to conclude:

> Since the term "growing crops" is undefined, a common understanding of the term can be used. Cal. Civ. Code § 1644. From a "lay" perspective, "growing crops" indicates crops that are still maturing in the field and are distinct from "harvesting crops,"

*Gerawan*, 2008 WL 80711, at *17, 2008 U.S. Dist. LEXIS, at *53. In reaching

---

Decl., Ex. C [Proof of Loss Letter] at SEM 00793 (emphasis added).) Accordingly, Seminis appears to be characterizing at least some of its Open Field Plants as both R & D material and lost sales/income, suggesting that Seminis believed that its Open Field Plants could be sold for profit or otherwise generate "gross earnings."

**3.** In *Gerawan*, the dispute was over whether the products at issue (nectarines) were dam-

aged by pitting while they were still "growing" (on the tree) or post-harvest, which would have made a difference in insurance coverage. *See Gerawan*, 2008 WL 80711, at *18, 2008 U.S. Dist. LEXIS 4511, at *55 ("Because the pitting afflicted the nectarines post-harvest and not while the nectarines were still on the trees/in the field, the evidence suggests that the ["growing crops"] exclusion [in the policy] does not control.").

this conclusion, the court also noted that "the general rule" in California is that "growing crops remain part of the realty until severed...." *Id.* at *17, 2008 U.S. Dist. LEXIS at *54 (*citing People v. Maxfield*, 30 Cal.2d 485, 488, 183 P.2d 897 (1947)). While, again, the focus for the *Gerawan* court was on the term "growing," it is telling that in determining the laymen's definition of "growing crops," the court made no mention of a requirement that the plant be sold in order to be a "crop."

### c. Statutes

Statutes also support Factory Mutual's position that the Open Field Plants are "growing crops." Seminis relies on California Commercial Code § 2105, which defines "goods" to include "growing crops." Cal. Com.Code § 2105(1). The Comment Section of the Code further provides that "[g]rowing crops are included within the definition of goods since they are frequently intended for sale." Cal. Com.Code § 2105 (Uniform Commercial Code Comment). Even if "growing crops" are frequently intended for sale, that does not mean that they are required to be sold. The same holds true for California Food & Agriculture Code § 5011 which provides that a "crop" is a "plant or animal, or a product derived from a plant or animal, that *can* be grown and harvested for profit or for the subsistence of humans or animals." Cal. Food & Agric. Code § 5011 (emphasis added).

### 3. THE DECLARATIONS FROM PURPORTED AGRICULTURAL EXPERTS ARE NOT RELEVANT BECAUSE SEMINIS DOES NOT SHOW THAT THE PARTIES INTENDED TO ASSIGN A TECHNICAL MEANING TO THE TERM "GROWING CROPS"

Seminis has provided declarations from two purported agricultural experts, Bernard Le Buanec and Nicholas Piggott, who both opine that the term "crop" means a plant that is grown for commercial purposes to be sold. (Piggott Decl. ¶ 7; Le Buanec Decl. ¶ 7.) However, the "ordinary and popular" sense of the term is to be used *"unless it is obvious* that the term was used in a technical sense, or that a special meaning is given to the term by its usage." 2 *Witkin* § 56 (*citing Havstad*, 58 Cal.App.4th at 660, 68 Cal.Rptr.2d 487) (emphasis added). Here, Seminis fails to demonstrate that the parties intended to ascribe a technical meaning to the term "growing crops" or that a special meaning has been given to that term by its usage. As such, the Le Buanec and Piggott Declarations do not help Seminis's cause.

### 4. SEMINIS EMPLOYEE EMAILS ARE RELEVANT TO SHOW THAT TERM IS REASONABLY SUSCEPTIBLE TO MEANING PROFFERED BY FACTORY MUTUAL

█ The most persuasive evidence in support of Factory Mutual's contention that the Open Field Plants are "crops" is found in Seminis's own internal documents, notably the flurry of emails sent between Seminis employees Carl Rentes and Toon van de Ven (Johnson Decl., Ex. C–E) shortly after the flood. In these emails, Rentes and van de Ven repeatedly refer to the damaged plants as "crops" and van de Ven even asks whether the damaged crops are located in the greenhouses or in the open fields. (Johnson Decl., Ex. D [9/9/05 Email].) *See S. Cal. Edison Co. v. Superior Court*, 37 Cal.App.4th 839, 851, 44 Cal. Rptr.2d 227 (Ct.App.1995) (party's conduct "is relevant, however, to show the contract is reasonably susceptible to the meaning evidenced by that party's conduct"); *see also Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, No. CV 05–8444 DDP, 2007 WL 2385134, at *10 (C.D.Cal. Aug. 16, 2007) ("these post-loss admissions demonstrate that Factory Mutual's understanding is at least reasonable").[4] These emails

---

4. Seminis relies heavily on *Northrop Grum-* *man* in its Opposition to argue that the Court

are relevant to establish the commonly understood scope and meaning of the word "crops."

### 5. SEMINIS'S PROFFERED EXTRINSIC EVIDENCE DOES NOT SUPPORT ITS POSITION

Furthermore, the Court disregards Seminis's proffered extrinsic evidence whereby it attempts to create ambiguity in the term "growing crops." Seminis offers deposition testimony from Seminis's risk manager, Patrick Turner, where he discusses conversations he had with Factory Mutual's account executive, Jeffrey Tenn. In his deposition testimony, Turner claims that the only conversations he had regarding "crops" dealt with the seeds that Seminis grew for actual sale and not for Seminis's research plants. (*See* Opp. at 4 (*citing* Seminis Separate Statement of Undisputed Facts ("SSUF") ¶ 22); Kornfeld Decl., Ex. D [Turner Depo.] at 23, 25, 27–28, 62–64, 118, 120.) Turner's testimony, however, fails to shed light on the parties' mutual understanding at the time of contract formation. Furthermore, "[c]ourts may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid." *Suarez,* 206 Cal.App.3d at 1403, 254 Cal.Rptr. 377. Accordingly, the Court concludes that Turner's testimony is not relevant.

### 6. BECAUSE THE TERM "GROWING CROPS" IS NOT AMBIGUOUS, THE COURT NEED NOT CONTINUE ITS ANALYSIS

Only if a policy provision is ambiguous should the Court then interpret the provision in the sense that the insurer believed the insured understood it at the time of formation, and if the ambiguity is still not resolved, the Court must then construe the language against the insurer. *See AIU,* 51 Cal.3d at 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (citation omitted). Because the contract language is not ambiguous, for the reasons discussed above, the Court need not reach these issues.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Factory Mutual's motion for partial summary judgment and finds that, as a matter of law, the Policy's "growing crops" exclusion precludes insurance coverage for the Open Field Plants at the Nimes facility.

IT IS SO ORDERED.

---

should disregard the emails because "post-loss admissions are irrelevant because they do not demonstrate the intent of the parties at the time of contracting." *Id.* at *10 n. 19. Even if this proposition is true, the Court may still consider the post-loss admissions to demonstrate that Factory Mutual's understanding was reasonable. *Id.* at *10. Seminis has filed evidentiary objections asking that the Court disregard the emails; for the above reasons, the objections are **OVERRULED.** Seminis also asks that the Court disregard the van de Ven email on the ground that Factory Mutual has not shown that it is authentic. (Opp. at 19–20 (*citing* Scheduling and Case Management Order at Section II.C.2).) Even if the van de Ven email were disregarded, the Rentes emails referring to "crops" are still relevant and support Factory Mutual's position.